Harold BRAHAM, Appellant,

v.

STATE of Alaska, Appellee.

No. 2558.

Supreme Court of Alaska.

Nov. 10, 1977.

**634**

David C. Backstrom, Deputy Public Defender and Mark E. Ashburn, Asst. Public Defender, Fairbanks, and Brian Shortell, Public Defender, Anchorage, for appellant.

David Mannheimer, Asst. Dist. Atty. and Harry L. Davis, Dist. Atty., Fairbanks, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, RABINOWITZ, CONNOR and BURKE, Justices, and DIMOND, Justice Pro Tem.

## OPINION

DIMOND, Justice Pro Tem.

In this criminal action, a contract is involved—a contract to kill.

According to testimony at the trial, appellant, Harold Braham, hired Jeffrey Koelzer to kill David Peterson. Braham was convicted of attempted first degree murder. He appeals on a number of grounds. The first is that the evidence was insufficient to warrant an indictment for attempted murder and also insufficient to withstand a motion for a judgment of acquittal at the close of the state's case. Before we address this question, the factual background of the case must be examined in some detail.

There was evidence indicating that Braham had a motive for having Peterson killed. Braham had introduced Peterson to an organization called the "Minute Men." Peterson testified he joined this organization and undertook assignments for the group, whose purpose was to be ready with paramilitary equipment to defend the Constitution. The organization, of necessity, was secret, and Peterson was instructed never to reveal the existence of the Minute Men or his connection with them. He was told that if he did this, it would be Harold Braham's job to see that he was killed.

Disregarding this admonition, Peterson went to the FBI and told them about the Minute Men in 1972. He said that his motivation for going to the FBI was a conversation he had with his attorney, following an attempt by Braham to hire him to kill a local lawyer whom Braham believed to be the head of "the communist group" in Fairbanks.

In June 1974, Peterson gave information to the police to the effect that a D-6 Caterpillar tractor had been stolen and that Peterson was willing to testify against the man who had stolen it.

A few days after this contact with the police, Peterson's trailer exploded while Peterson was in it, apparently as a result of a bomb placed in the trailer. Peterson was not injured. Approximately one month later, on July 14, 1974, Peterson was driving down the Elliott Highway, north of Fairbanks, when several shots were fired into his vehicle, wounding him severely. He was taken to the Fairbanks Community Hospital for medical treatment. Although investigations were made, no person was charged or apprehended for bombing Peterson's trailer or for shooting him.

Jeffrey Koelzer had known Harold Braham for five or six years and, during that period of time, had several business transactions with him, some of which involved the sale of illegal weapons. In early July Koelzer had a conversation with Braham in which Braham expressed regret that the explosion in the trailer had not killed Peterson, and Braham asked Koelzer if he might

be interested in "doing" Peterson, i. e., killing him. Braham offered Koelzer $600, which he said he would collect from a group of individuals if Koelzer would kill Peterson. Koelzer was, at this time, about to go to Valdez, but he promised Braham that he would consider the offer and that he was definitely interested.

Koelzer returned from Valdez on July 22, 1974, and a few days later was informed by Braham that Peterson had been shot and was in the hospital. Koelzer indicated that he was willing to undertake the killing of Peterson, and a contract was made that Koelzer would kill Peterson and would receive $600 from Braham.

At this meeting between Braham and Koelzer, Braham requested Koelzer to visit Peterson in the hospital and deliver a fictitious message to him concerning Peterson's wife. The content of the message, which Koelzer delivered to Peterson, was that Peterson's wife was engaged in acts of infidelity with a trapper in his cabin out on the Steese Highway.

Koelzer went to the hospital to see Peterson. At this time it was Koelzer's intention to carry out the contract and collect the money.

A short time later, Koelzer was contacted by the Alaska State Troopers and the questions which they asked worried him. The Troopers seemed to know too much about the contract which had just been agreed upon. A short time after that, Koelzer decided that he wanted nothing to do with the contract and that he had better aid the State Troopers in their investigation because if Peterson were killed in the meantime, Koelzer might be charged with the murder. In return for his aid in getting evidence against Braham and for his testimony before the grand jury, the State Troopers offered Koelzer the $600 which he was to receive from Braham for killing Peterson.

After this arrangement had been made between Koelzer and the police, Koelzer went to visit Braham at the request of the police. He discussed the killing of Peterson with Braham, asking Braham if he could supply a gun since Koelzer only had a .22 magnum. Braham told him that a .22 magnum would be enough if the shots were at point-blank range and that, further, it would be impossible for Braham to get a weapon from his "stash" since the police were watching him too closely. Koelzer then told Braham how the murder was to be accomplished, i. e., by taking Peterson out to 12 Mile Chena Hot Springs Road, shooting him and then burying his body in some marshy ground.

At the instance of the police, Koelzer called on Braham on August 13, 1974. At this meeting, Braham was told that he should get his alibi ready for the next day and to be sure to have the money together. Braham responded that he had been experiencing some difficulty in collecting the $600 from other interested parties, but that he could guarantee at least $300 by the next day, as he had $100 from another man and he himself was willing to ante up $200 for killing the "son-of-a-bitch."

The proposed killing was arranged for August 14 at 9:30 a. m. Braham and Koelzer discussed what proof Braham would require as evidence of the performance of the agreement. Braham suggested that Koelzer bring Peterson's gun, which Peterson had kept by his side 24 hours a day since the attempts were made on his life. Koelzer thought that Peterson had a .44 magnum. This provided Braham with the opportunity to test whether Koelzer killed Peterson: if Koelzer brought back a .44 magnum, Braham would know that Koelzer was lying, for Braham knew that the gun which Peterson had was a .41 magnum.

The next morning Koelzer called Braham from state police headquarters, telling Braham that Peterson was going to be late to their rendezvous and that Braham should have his alibi ready for a later hour. At this time Braham suggested to Koelzer in a roundabout manner that Koelzer should bring with him one of Peterson's toes as proof of the killing.

The state police drove Koelzer out to 12 Mile Chena Hot Springs Road. He moved

Peterson's truck and collected Peterson's keys and gun. In the meantime, Peterson had been flown to Minto Flats, a remote area, by the troopers to hide out so as not to be seen by any interested party. That evening Koelzer telephoned Braham and told him that the job was done.

The next day Koelzer met with Braham. Koelzer gave Braham Peterson's gun (a .41 magnum) and keys in a pink paper bag. Braham was pleased to find the keys and the .41 magnum inside the bag. Braham accepted Koelzer's excuse of nervousness and waived the requirement of Peterson's toe. Braham wiped off the gun and hid it in his truck and then he paid Koelzer $300, stating that he still hadn't been able to contact the other potential donors.

## ATTEMPTED MURDER

■ In order for one to be guilty of attempted murder, there must have occurred during the attempt an "act toward the commission" of the murder.[1] The maximum penalty for attempted first degree murder is ten years.[2]

■ On the other hand, it is also a crime for one to willfully and knowingly solicit, incite or induce another to commit a felony, and the maximum penalty for this crime is three years imprisonment.[3] The question we are faced with in this case is whether the evidence established an attempted murder on Braham's part, or whether it showed that he only solicited, induced or incited Koelzer to commit the murder of Peterson.

We stated in *Whitton v. State*, 479 P.2d 302, 304 (Alaska 1970):

It is within the traditional scope of legislative power to deter anti-social behavior by enacting laws proscribing, under the pain of punishment, certain courses of human conduct considered to be detrimental to an ordered society.

Certainly, first degree murder is seriously detrimental to an ordered society, as is reflected by the legislature's act in providing severe punishment for that crime. And in order to give recognition to society's continuing legitimate interest in the protection of a person, it is also considered detrimental to an ordered society for one to attempt to commit murder, even though he does not succeed in the attempt. Where there is an attempt to commit murder, there is always present a threat of fear, force and violence—and even death to a person—so that proscribing such an act, under pain of punishment, is essential in order that life in society may exist, and in existing, may be tolerable.

■ But there is also a countervailing policy: society (at least in a democracy such as ours) does not punish one for his thoughts alone, regardless of how malevolent they may be. If the law were otherwise, there would be an intolerable invasion of one's privacy; man would be reduced to abject slavery, or something worse. Thus, there is some point between the formation of a criminal plan in one's mind and one's action in trying or making an effort to commit the crime that the law, for society's protection, imposes criminal sanctions even though the crime is never consummated.

■ It is often difficult to determine when this point has been reached. But it is agreed among the courts and scholars that

---

1. AS 11.05.020 provides in pertinent part:

 A person who attempts to commit a crime, and in the attempt does any act toward the commission of the crime, but fails, or is prevented or intercepted in the perpetration of the crime, when no other provision is made by law for the punishment of the attempt, upon conviction, is punishable as follows.
 (1) . . . If the period prescribed as a punishment for the crime is an indeterminate or life term, the punishment for the attempt shall be fixed by the court at a term not more than 10 years.

2. *Supra* n. 1. The punishment for first degree murder is imprisonment for not less than 20 years to life. AS 11.15.010.

3. AS 11.10.070 provides in pertinent part:

 A person who wilfully and knowingly solicits, incites or induces another to commit a felony or a misdemeanor in the state,
 (1) if the act solicited, incited or induced is a felony, is guilty of a felony and upon conviction is punishable by a fine of not more than $3,000, or by imprisonment for not more than three years, or by both; . . .

when one's acts are of such a preliminary nature so as to constitute mere preparation for the contemplated crime, there is no crime of attempt.[4] That is why our statute requires, in addition to the plan to commit a crime, that there be in the course of such plan the doing of an "act toward the commission of the crime" before an "attempt" has been made under the statute.[5] Also, although the word "act" in the statute is not modified by an adjective, the courts are generally in agreement that the act be "overt", i. e., "an outward act done in pursuance and manifestation of an intent or design." [6]

■ Some cases are fairly easy of solution, others are not. Whether acts taken or done in contemplation of the commission of a crime are merely preparatory and do not constitute attempt, or whether they are sufficiently close to the consummation of the crime to amount to attempt, is a question of degree and depends upon the facts and circumstances of a particular case.

In a situation where one contracts with another to commit a crime, the question of what acts by the former are sufficient to constitute a criminal attempt has been the subject of considerable discussion and varying results by the courts of other jurisdictions.[7] Some courts hold that the making of the contract by itself amounts to only solicitation and preparation and that the

crime of attempt has not been committed.[8] There is other authority for the proposition that when the one hiring another to commit a crime has done everything he can to accomplish the criminal act through the hand of another and his conduct is no longer equivocal, but indicates that his criminal design will be carried into effect if not interrupted, then he (the employer) has committed the crime of attempt.[9]

■ We acknowledge the fact that it is difficult to define precisely the line between preparation and attempt in some cases. But that line can be defined with a reasonable degree of certainty in holding that, in the area of attempt, criminal culpability is present where there is the formation of criminal attempt, a preparation to commit the crime, and a direct unequivocal act toward its perpetration. That is what we have here. Prior to the time Koelzer became associated with the State Troopers, he had entered into a contract with Braham to kill Peterson. After settling on the contract price—$600—Braham instructed Koelzer to go to the hospital and see Peterson.

The purpose of this hospital visit was to bring Peterson and Koelzer together to allow Koelzer to gain Peterson's trust and confidence so that Koelzer could "get close" to Peterson. Later, but still prior to police contact, Koelzer informed Braham the message had been delivered, to which Braham

4. *See generally*, Sayre, *Criminal Attempts*, 41 Harv.L.Rev. 821, 843–58 (1928); Perkins *Criminal Law*, 561–66 (2d ed. 1969). *See also, Gargan v. State*, 436 P.2d 968, 971 n. 9 (Alaska 1968).

5. AS 11.05.020, *supra* n. 1.

6. Black's Law Dictionary at 1258 (Revised 4th ed. 1968). In defining the word "act", as that term is employed in the context of the attempt statutes, courts have used similar but varied terminology—often within a single case. There is authority to the effect that the act must be "unequivocal", *State v. Gay*, 4 Wash.App. 834, 486 P.2d 341, 346 (1971) and *State v. Schenk*, 53 Wis.2d 327, 193 N.W.2d 26, 29 (1972); that the act must be "direct", *State v. Lenahan*, 12 Ariz.App. 446, 471 P.2d 748, 752 (1970); that the act must represent the "commencement of the consummation" of the crime, *People v. Parrish*, 87 Cal.2d 853, 197 P.2d 804, 807 (1948) and *State v. Gay, supra*, 486 P.2d at 345; and

that the defendant must have engaged in conduct which constituted "a substantial step toward commission of the crime", with the requirement that the substantial step "must be conduct strongly corroborative of the firmness of the defendant's criminal intent", *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir. 1974).

7. As to attempted murder, *see* Annot. 54 A.L. R.3d 612 (1973).

8. *People v. Adami*, 36 Cal.App.3d 452, 111 Cal. Rptr. 544 (1973); *State v. Davis*, 319 Mo. 1222, 6 S.W.2d 609 (1928).

9. *United States v. Coplon*, 185 F.2d 629 (2d Cir. 1950); *State v. Gay*, 4 Wash.App. 834, 486 P.2d 341 (1971); *State v. Mandel*, 78 Ariz. 226, 278 P.2d 413 (1954). *See United States v. Mandujano*, 499 F.2d 370 (5th Cir. 1974).

replied, "Good." Koelzer's testimony on this point is significant:

Q Did Harold send you to the hospital or did you go to the hospital to buy this truck?

A I went to the hospital to relay the message that Harold had given me. At the same opportunity, I talked to Mr. Peterson about the truck and also trying to get closer to Peterson, at a later date so that—you know—I probably wouldn't be suspected of anything.

Q So in other words, you're saying that this whole thing about going to buy the truck was just really a fiction that you were using it to get close to Peterson?

A I was quite interested in the truck, but I was just trying to get close to Peterson, yes.

■ It is apparent that, when Braham instructed Koelzer to visit Peterson, his intention was that there would be fostered a relationship of trust and confidence between Koelzer and Peterson, thus placing Koelzer in a position where he would be closer to Peterson and could more readily kill him. We conclude that Koelzer's visit with Peterson in the hospital, at Braham's direction, was the doing of a direct, unequivocal "act toward the commission of the crime" of murder within the meaning of AS 11.05.020, which followed the formation of a criminal intent and a preparation to commit this crime.

We hold, therefore, that the evidence presented to the grand jury was sufficient to sustain the indictment for attempted first degree murder. We also hold that the evidence presented at the trial was sufficient to withstand a motion for a judgment of acquittal and was sufficient to support the jury's verdict finding Braham guilty of attempted murder.[10]

10. We take this opportunity to note the apparent inadequacy of AS 11.05.020 to codify effectively as a crime the situation involving the single act of contracting for another to perform a criminal act. We are not unaware of the increased frequency with which various crimes are performed in this "business-like" manner.

## ENTRAPMENT

■ After Koelzer had agreed to take the "contract" from Braham to kill Peterson and, at Braham's direction, had visited Peterson at the hospital, Koelzer was interviewed by the police. The police offered to pay him $600 for his cooperation on the following conditions: if Koelzer provided evidence that Braham was serious about killing Peterson, if a charge was brought against Braham as a result of such evidence, if Koelzer testified before the grand jury and an indictment was returned, and if Braham was convicted of the offense charged in the indictment. Braham contends that this arrangement constituted entrapment and, therefore, that Braham was entitled to a judgment of acquittal.

The test of entrapment has been stated by this court in *Grossman v. State*, 457 P.2d 226, 229 (Alaska 1969):

[U]nlawful entrapment occurs when a public law enforcement official, or a person working in cooperation with him, in order to obtain evidence of the commission of an offense, induces another person to commit such an offense by persuasion or inducement which would be effective to persuade an average person, other than one who is ready and willing, to commit such an offense. Conversely, instigations which would induce only a person engaged in an habitual course of unlawful conduct for gain or profit, does not constitute entrapment. [footnote omitted]

The evidence here does not support the defense of entrapment under *Grossman* or, as we stated in *Evans v. State*, 550 P.2d 830, 845 (Alaska 1976), does not present a case of government-sponsored criminality. We reach this result based on the timing of the events of this crime. Koelzer began

We would hope that this statutory gap would be cured by a statute which clearly defined the act of contracting for the perpetration of a criminal act as a crime in and of itself, and which further provided for a punishment commensurate with the premeditated nature of this kind of action.

working in cooperation with the police only after Braham had contracted with him to commit the murder of Peterson. Koelzer had agreed to the arrangement and had taken the first step toward consummation of the crime by going to see Peterson at the hospital. The evidence does not establish that Braham was in any way persuaded or induced to employ Koelzer to kill Peterson. Braham had committed the crime of attempted first degree murder prior to the time that Koelzer agreed to cooperate with the police.

## MENTAL EXAMINATION OF PETERSON

 David Peterson was the state's witness. Before the start of cross-examination and out of the presence of the jury, there occurred a discussion between counsel and the trial judge regarding the latitude of the cross-examination of Peterson. Defense counsel stated he would attempt to elicit from Peterson certain mental difficulties as exhibited by Peterson's bizarre behavior in the past and as indicated by Peterson's affliction with a disease which caused psychotic episodes in his life. The judge ruled that such evidence would be admissible. At this point, the following colloquy took place between the judge and defense counsel:

> THE COURT: . . . Now, I think that the defense is entitled to go into his motives, his underlying mental condition, with regard to having made these statements. And the defense is not precluded from going into this. And if Mr. Peterson is—certainly there is—he is qualified to testify as to his own condition, and if necessary, I suppose, that the court could have an independent mental examination.
>
> MR. RUBINSTEIN: I would move for such an examination, Your Honor.
>
> THE COURT: But there's no time for it. If a person, being a witness, and the jury is expected to believe a person, they're—the jury is entitled to know as much about that person as possible. And

if a person—a witness does have mental problems, the jury is certainly entitled to take that into consideration in weighing the credibility of the witness that testifies.

Braham contends that the court's failure to order a mental examination of Peterson was error.

We have held that it is clearly open to the defense to show that, because of some mental abnormality, a witness' capacity for accurate perception and recollection has been impaired.[11] Defense counsel was afforded this opportunity in being permitted to cross-examine Peterson at some length regarding his behavior and mental problems.

At the end of the cross-examination of Peterson, defense counsel did not renew his motion to have a mental examination made. Nor does he indicate in his brief on appeal why he did not request such an examination of the witness prior to trial when he was aware of certain behavior by Peterson in the past which might well have indicated that Peterson had experienced psychotic episodes from time to time.

When the court mentioned, more or less as an afterthought, that "if necessary, I suppose, that the court could have an independent mental examination", defense counsel merely said: "I would move for such an examination . . ." He did not press the point further at that time, nor did he refer to it again after his rather extensive cross-examination of Peterson.

The cross-examination of Peterson brought before the jury certain characteristics of Peterson's behavior that could have been construed as indicating mental difficulties. Defense counsel thus was allowed and availed himself of the opportunity to show facts which might appear to the jury as amounting to an impairment of Peterson's capacity for accurate perception and recollection.[12] From what we see from the record, defense counsel apparently decided to abandon any further effort to have a

11. *Bakken v. State*, 489 P.2d 120, 124 (Alaska 1971).

12. *Id.*

psychiatric examination of Peterson following his effective cross-examination on this subject.

It is within the discretion of the trial court whether to order a psychiatric examination of the mental condition of a witness.[13] In order to reverse the trial judge, we would have to find an abuse of that discretion. We find none here.

## OTHER ATTEMPTS ON PETERSON'S LIFE

There was an explosion in Peterson's trailer while he was in it—apparently from a bomb. Koelzer testified that Braham talked to him about the explosion, saying: "It's just too God damn bad the motherfucker didn't get it, that he should have gotten it just from the impact alone—the impact should have killed him." Koelzer also said that Braham told him that "it [apparently the bomb] was under the stove or the refrigerator, towards the center of the trailer." It was during this conversation that Braham discussed with Koelzer the "contract" under which Koelzer was hired by Braham to kill Peterson for $600.

Koelzer was also asked whether there had been any discussion with Braham concerning the shooting of Peterson in July 1974. Koelzer stated that Braham told him "that it was too bad that he missed and that he was shot with a .30–30 rifle."

Braham contends the state did not prove that Braham had anything to do with the explosion or the shooting; and, therefore, the admission of Koelzer's testimony as to what Braham's views were on these incidents was highly prejudicial and amounted to reversible error. The error was compounded, Braham contends, when the prosecuting attorney, in final argument, said:

In fact, the evidence is quite clear that Mr. Braham had an ironclad alibi when the shooting took place. It's kind of curious though, that right at the time of the shooting is when he had his ironclad alibi.

Just like, if this murder had taken place, he would have had another ironclad alibi.

In *Eubanks v. State*, 516 P.2d 726, 729 (Alaska 1973), we stated:

Unless evidence revealing the commission of an offense for which the accused is not charged is relevant to a material fact in the case at trial, it is not admissible. *Watson v. State*, 387 P.2d 289, 293 (Alaska 1963). Even when such evidence is relevant, the probative value must outweigh its prejudicial impact. *Howard v. State*, 496 P.2d 657, 661 (Alaska 1972); *Gafford v. State*, 440 P.2d 405, 408 (Alaska 1968), cert. denied 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 125 (1969).

An inference that the jury might well have drawn from this testimony by Koelzer would be that Braham had something to do with the two prior attempts on Peterson's life. To this extent, the evidence had a prejudicial effect. But this must be weighed against its probative value. The purpose and effect of Koelzer's testimony was not to prove that Braham was guilty of two prior attempts on Peterson's life. Rather, it was introduced for the purpose of showing that, since such incidents figured heavily in conversations between Braham and Koelzer, and Braham had knowledge of the attempts and gave them his moral support, Koelzer's testimony that Braham wanted Peterson killed would be credible. At the trial, this issue was hotly disputed by Braham.

The evidence in question would tend to show that it was not unbelievable, as Braham contended, that Braham had hired Koelzer to kill Peterson. The record demonstrates that the evidence of prior attempts was so integrated into the story of this crime, that to exclude it would have made the factual setting of this crime incomprehensible to the fact finder. Thus the need to admit this evidence was great, and it had the permissible effect of completing the picture or setting the stage of the crime for which Braham was being tried—the at-

**13.** *McMaster v. State*, 512 P.2d 879, 881 (Alaska 1973).

tempted murder of Peterson.[14] There was no error in admitting such evidence.

On the other hand, there is no justifiable basis for sustaining or condoning the comments by the prosecuting attorney on such evidence, which we have quoted above. They were highly improper because he inferred that Braham had had something to do with the other attempts on Peterson's life. However, the prejudicial impact of these remarks (as well as the prejudicial effect of the evidence referred to above) were alleviated by an instruction given the jury by the court. Instruction No. 15 provided:

> Evidence has been presented in this case that David Peterson's trailer was exploded by unknown means and by an unknown hand, if any. Evidence has also been presented that David Peterson was the victim of a shooting, also by an unknown person. You are instructed that the defendant, Harold Braham, is not charged with either of these crimes and neither evidence of the shooting nor of the explosion may be considered by you in any manner in reaching your verdict in this case.

There was no reversible error.

## UNLAWFUL DEALINGS BETWEEN BRAHAM AND KOELZER

■ Over objection, Koelzer was permitted to testify that, in the past, over a period of five or six years, he had sold Braham stolen merchandise, principally guns. Braham contends the admission of such evidence was prejudicial error.

This evidence had a rational tendency to show that Braham knew what kind of a man he was dealing with when he offered the "contract" to Koelzer, that he trusted Koelzer because of his criminal proclivities to be able to discuss with him the murder of Peterson and, therefore, that it was not unbelievable that Braham would offer $600

to Koelzer to murder Peterson. This evidence had the effect of advancing the inquiry into Braham's motive or state of mind and, therefore, was relevant to a material issue in the case.[15] The probative value of the evidence outweighed any prejudicial effect it may have had. *Eubanks v. State*, 516 P.2d 726, 729 (Alaska 1973).

## DISCOVERY—COMPULSORY PROCESS

Alaska Rule of Criminal Procedure 16 deals with discovery. The broad scope of discovery under that rule is stated in subdivision (a) as follows:

> In order to provide adequate information for informed pleas, expedite trial, minimize surprise, afford opportunity for effective cross-examination, and meet the requirements of due process, discovery prior to trial should be as full and free as possible consistent with protection of persons, effective law enforcement, and the adversary system.

However, the rule also provides that in certain instances discovery may be regulated.[16] Thus, Criminal Rule 16(d)(6) provides:

> Upon request of any party, the court may permit
>
> (i) any showing of cause for denial or regulation of disclosure, or
>
> (ii) any portion of any showing of cause for denial or regulation of disclosure
>
> to be made to the court in camera ex parte. A record shall be made of such proceedings. If the court enters an order granting relief following such a showing, the entire record of the proceedings shall be sealed and preserved in the records of the court, to be made available to the supreme court in the event of an appeal.

Defense counsel had sought discovery of matters showing the relationship or connection between Koelzer and the police on matters not related to Braham between the

---

**14.** *Dulier v. State*, 511 P.2d 1058, 1061 (Alaska 1973); *Kugzruk v. State*, 436 P.2d 962, 967 (Alaska 1968).

**15.** McCormick, Law of Evidence § 157(6) at 330 (1954).

**16.** *See Carman v. State*, 564 P.2d 361 (Alaska 1977).

time of Braham's arrest in August 1974, and the time of the trial in April 1975. The prosecuting attorney resisted these attempts at discovery and, with the consent of the trial judge, utilized Criminal Rule 16(d)(6) in order to have limitations placed on the discovery sought by the defense.

A conference was held between the trial judge and the prosecuting attorney on April 2, 1975. Defense counsel was excluded. The prosecutor represented to the judge that the matters sought to be discovered related to the fact that Koelzer had been working for the state as a narcotics informer, that he had made various narcotic transactions involving the purchase of heroin or cocaine, and that, if these activities were revealed at a time before indictments were obtained by the state against the narcotics offenders Koelzer had dealt with, Koelzer's "cover" would be destroyed. It appears that the basis for non-disclosure on which the prosecuting attorney relied was that to allow discovery of such matters would be inconsistent with effective law enforcement.

The prosecuting attorney, however, stated to the judge at the ex parte conference that he would issue complaints and arrests and search warrants and would take his drug cases to the grand jury on Friday, April 4. He also stated that after that date he could make the police reports involving Koelzer's activities available to defense counsel on Saturday, April 5, so that counsel for Braham would have them available for cross-examination of Koelzer on Monday, April 7. He then requested that discovery be deferred until Saturday morning, April 5, and the judge said "All right. So ordered."

But this was not the end of the ex parte proceeding. After the court had ordered "deferred discovery", the following colloquy between the prosecuting attorney and the judge ensued:

MR. DAVIS: And at that time—I shall also supply the court ahead of time—I can supply the court our police reports; allow the court to read through the police reports, and determine what information should be discovered, and what not should

be [sic] discovered. But I'll leave that up to the court. And my only objection would be on grounds of relevancy. I see no relevancy betw—allowing the complete narcotics surveillance and our intelligence information to be supplied to Mr. Harold Braham.

THE COURT: All right. I—it's a valid reason. I . . . ..

MR. DAVIS: I have nothing else, Your Honor, besides that.

THE COURT: All right.

MR. DAVIS: I would tell Mr. Rubinstein that the—what tha—additional information, whatever the court ruled, would be supplied to him for cross-examination—whatever is deemed to be relevant by the court.

THE COURT: That—that's your—in your discretion.

MR. DAVIS: Okay.

At the end of the day on Friday, April 4, right before the jury was sworn and told that the trial would commence the following Monday, the following dialogue took place between the judge and defense counsel:

THE COURT: All right. 10:00 o'clock. I'll make the—have the jury come in at 10:00 o'clock on Monday morning, and we'll continue then at 8:30 on whatever matter that Mr. Davis has to bring up and whatever arguments are anticipated. There is another matter, I think, that I should advise counsel of. Mr. Davis presented certain matters in camera—a sealed envelope containing certain information, and the court has examined that and finds that it would—that it should not be used in the trial of this case. I can't say anything more than that Mister . . . ..

MR. RUBINSTEIN: Well, then I—not knowing what it is . . . ..

THE COURT: I under . . . ..

MR. RUBINSTEIN: . . . . I believe that I should probably be entitled to it to cross-examine Mr. Koelzer if it is relevant to some police contacts between Mr. Koelzer—with Mr. Koelzer subsequent to the defendant's arrest before the trial. So I would object . . . ..

THE COURT: Well . . ..

MR. RUBINSTEIN: . . . . to it to not being made available.

THE COURT: I understand, and your objection is certainly noted and the documents along with the other in camera matter are ordered sealed and to be made a part of the record of this case. I suppose if I could disclose it, it would be—solve the problem, but I can't do that . . ..

Nothing was said by Mr. Davis, the district attorney, as to his representations to the judge at the ex parte proceeding that he would make the material in question available to Mr. Rubinstein by the time the cross-examination of Koelzer was to begin.

 We fail to understand why the judge ruled as he did. According to representations made by Mr. Davis at the ex parte hearing, the material which was not permitted to be seen by defense counsel ought to have been available to him on Saturday, April 5, or at least on the following Wednesday, April 9, when he cross-examined Koelzer. There was no showing whatever that making the material available to Braham's counsel would not have been consistent with the protection of persons or effective law enforcement. In these circumstances, we are constrained to hold that the judge was clearly mistaken in blocking the efforts of the defense to discover evidence the prosecutor had, which related to Koelzer's association with the police between the time of Braham's arrest and the time of trial.

Although the district attorney stated to the judge at the ex parte hearing that he would make the material available to defense counsel by Saturday morning, the record shows that the district attorney also objected to disclosure of the material on the ground that it was not relevant.

Non-disclosure was proper only if (1) the prosecution showed that discovery of the evidence would be inconsistent with protection of persons or enforcement of the laws and (2) the trial judge concluded that the material was not relevant [17] to the defense. If the district attorney failed to show that disclosure would harm enforcement or protection efforts, the material must be disclosed. The question of relevance would then be decided in an adversary context; both counsel would have the opportunity to make their respective arguments.

Disclosure is also required if the judge's in camera inspection showed that the material was relevant to the defense—whether or not the prosecutor had demonstrated that discovery would be inconsistent with enforcement or protection efforts. In the latter circumstance, the state must decide between continuing to prosecute, while incurring the problems posed by disclosure, and terminating the prosecution in order to maintain the material's secrecy.[18]

 This interpretation of Criminal Rule 16 may appear harsh so far as the

17. The words "relevant" or "relevancy" encompass the concept of materiality. We have held in a number of cases that for evidence to be admissible it must be relevant, and to be relevant, it must tend to establish a material proposition. *Hartsfield v. Carolina Cas. Ins. Co.*, 451 P.2d 576, 578 (Alaska 1969); *Mitchell v. Knight*, 394 P.2d 892, 894 (Alaska 1964). In *Poulin v. Zartman*, 542 P.2d 251, 260 (Alaska 1975), the court stated:

Alaska case law defines the test of relevance. "To be of sufficient relevance for admission, testimony, documents or other evidence must have some tendency in reason to establish a proposition material to the case." The dual concepts of logical relevance, i. e., some tendency to establish the ultimate point for which the evidence is offered, and materiality, i. e., germaneness of the ultimate point to issues in the trial, have been emphasized repeatedly in our opinions. [footnote and citation omitted]

18. In a similar situation where the defendant was seeking evidence relevant to an alleged fourth amendment violation, with non-disclosure of wiretap evidence argued based upon a national security claim, the United States Supreme Court stated in *Alderman v. United States*, 394 U.S. 165, 181, 89 S.Ct. 961, 970, 22 L.Ed.2d 176, 191 (1969):

The Government concedes that it must disclose to petitioners any surveillance records which are relevant to the decision of this ultimate issue. And it recognizes that this disclosure must be made even though attended by potential danger to the reputation or safety of third parties or to the national security—unless the United States would pre-

prosecution is concerned. But the defendant is entitled to have access to all relevant evidence in the possession of the state in order that he be afforded his right to a fair trial. The question of whether he has a fair trial relates to constitutional guarantees such as due process and the right to have compulsory process for obtaining witnesses in his favor.[19]

It is the latter right that we are chiefly concerned with here. It is true that the constitutional provisions speak of compulsory process for "obtaining witnesses" in a defendant's favor. But this clause has been construed as applying as well to documentary evidence. This was recognized as early as 1807. In the treason trial of former Vice President Aaron Burr, Chief Justice Marshall, as circuit justice, ruled that a letter in the custody of President Thomas Jefferson must be produced for the defendant's inspection under the compulsory process clause.[20] This historical ruling was given great weight in *United States v. Schneiderman*, 106 F.Supp. 731 (S.D.Cal.1952), which discussed the clause at length and concluded that it required the production of investigative reports of government witnesses for use by a defendant in a Smith Act prosecution.[21] This case was cited with approval in *Jencks v. United States*, 353 U.S. 657, 668 n. 13, 77 S.Ct. 1007, 1 L.Ed.2d 1103, 1112 (1957). The proposition that the compulsory process clause requires prior statements of witnesses to be produced was also

noted by Justice Brennan, concurring in *Palermo v. United States*, 360 U.S. 343, 362, 79 S.Ct. 1217, 3 L.Ed.2d 1287, 1300–01 (1959) (Brennan, J., concurring), and was one basis for upholding a subpoena *duces tecum* directed at President Richard Nixon for production of tapes and documents.[22]

In *Johnson v. Johnson*, 375 F.Supp. 872, 875 (W.D.Mich.1974), the following language is instructive on the reach of the clause:

> The right of 'compulsory process' implies that the prosecution on request and the trial courts have some duty to apply the state's resources and power in appropriate circumstances to ensure a fair trial, especially where the defendant is indigent.

> This conception is certainly consonant with long-established principles of due process. The prosecution's constitutional duty to disclose exculpatory material statements of witnesses on the defendant's request, *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), is clearly within the sphere of influence of the Sixth Amendment's compulsory process guarantee.

Two state cases[23] have interpreted the clause, and one law review[24] article has

---

fer dismissal of the case to disclosure of the information.

In accord is *West v. United States*, 274 F.2d 885, 890 (6th Cir. 1960), where the defendant objected to portions of official FBI reports being withheld after the trial judge undertook an in camera inspection of the reports. In upholding the trial court's exclusion of portions of the reports, the Court of Appeals noted:

> He [the trial judge] did not sustain the making of the excisions on the basis of internal security considerations. On the contrary, he held that even though the statements might affect internal security, nevertheless, if they contained matters relevant to the testimony of the witness, they would have to be furnished or the case dismissed.

**19.** United States Const. 6th Amendment; Alaska Const. art. I, § 11.

**20.** *United States v. Burr*, 25 F.Cas. 30, 33 (C.C. Va.1807) (No. 14,692d). *See also, United*

*States v. Burr*, 25 F.Cas. 187, 190–93 (C.C.Va. 1807) (No. 14,694).

**21.** *See also, Wilson v. United States*, 221 U.S. 361, 372, 31 S.Ct. 538, 55 L.Ed. 771, 776 (1911).

**22.** *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

**23.** *Sosa v. State*, 215 So.2d 736, 740–41 (Fla. 1968) (federal compulsory process clause allows defendant access to prosecution witnesses' statements); *State v. Lerner*, 112 R.I. 62, 308 A.2d 324, 335 (1973) (Rhode Island constitutional guarantee of compulsory process extends to right of defendant to pretrial interview with consenting prosecution witness under subpoena).

**24.** Westen, "The Compulsory Process Clause", 73 Mich.L.Rev. 71, 125–26 (1974).

given extensive treatment to its implications.

The documentary material, which Braham sought to discover, consisted of a detailed written account showing that, on 16 separate occasions, between December 5, 1974, and March 31, 1975, Koelzer had been acting as an informer for the police in obtaining evidence of illicit drug sales involving 12 different persons, who were eventually prosecuted by the state on drug offenses. The obvious purpose of having this material available to the defense was to afford Braham's counsel the opportunity, in cross-examining Koelzer, to show that he had participated in so many drug purchases—possibly in order to curry favor with the police or to obtain some other advantage—that bias on Koelzer's part would be disclosed.

In past decisions, we have consistently held that it is essential to a defendant's right to a fair trial that he be allowed every opportunity to show bias on the part of a witness testifying against him.[25] If Braham's counsel was unduly limited in his right of cross-examination to show bias on Koelzer's part by the failure of the state to produce the documentary material referred to, then there must be a reversal and a new trial. This would be necessary because the error of the court in denying discovery of the documents would be in violation of Braham's federal and state constitutional right to be allowed "compulsory process" to obtain such evidence.

■ All federal constitutional errors, however, are not always deemed harmful so as to require an automatic reversal of a conviction. There may be harmless constitutional error. But before a federal constitutional error can be held harmless, "the court must be able to declare a belief that it is harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 709–11 (1967). Or to put it another way, the state must establish beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.[26]

We have utilized this standard in past decisions. In *Evans v. State*, 550 P.2d 830, 840 (Alaska 1976) we stated:

Inasmuch as we have concluded that the superior court erred in unduly restricting the exercise of Evans' constitutional right of cross-examination, we must consider the effect of this error. It is evident . . . that the appropriate standard of review in a case of this nature is the constitutional harmless error standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Inasmuch as our own decisions are not entirely consistent on this point, we take this opportunity to reaffirm that when a criminal defendant is denied his constitutional right to confront and cross-examine his principal accuser, the *Chapman* standard controls the effect of that error. That standard requires reversal unless this court can declare a belief that the error was "harmless beyond a reasonable doubt." [footnotes omitted][27]

In the case of *Davis v. State*, 499 P.2d 1025 (Alaska 1972) (Justice Rabinowitz dissenting), this court refused to permit cross-examination of the state's key witness as to his juvenile conviction and resultant probation status, from which the jury could have inferred bias and a motive for his testimony. In reversing this court in *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347, 355 (1974), the United States Supreme Court stated:

While counsel was permitted to ask Green *whether* he was biased, counsel

---

**25.** *Salazar v. State*, 559 P.2d 66, 78–79 (Alaska 1976); *Evans v. State*, 550 P.2d 830, 836–40 (Alaska 1976); *Hutchings v. State*, 518 P.2d 767, 769 (Alaska 1974); *RLR v. State*, 487 P.2d 27, 44 (Alaska 1971); *Whitton v. State*, 479 P.2d 302, 316–17 (Alaska 1970).

**26.** *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, 710–11 (1967).

**27.** *See also, State v. Hannagan*, 559 P.2d 1059, 1065 (Alaska 1977).

was unable to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness or, as the prosecutor's objection put it, a "rehash" of prior cross-examination. On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." [Citation omitted]

In contrast to *Davis*, the jury here was made aware of the fact that Koelzer had a prior conviction for receiving stolen goods and was under a suspended sentence. Koelzer admitted lying to the police, which would have an effect as to his credibility as a witness against Braham. More directly on point was Koelzer's testimony that he had agreed to kill Peterson for the sum of $600 to be paid by Braham and, that subsequently, he turned informer against Braham for a like sum to be paid to him by the police. He also testified that he was motivated to cooperate with the police, in part, by his personal apprehension of being involved criminally in the attempted murder.

Defense counsel cross-examined Koelzer as to his being an informer for the police, which was the subject of the police reports that were not made available. Counsel's examination of Koelzer on this point was as follows:

Q Do you have any continuing relationship with the State police at this time?

A Yes.

Q Are you presently employed for the State police in any capacity?

A Yes.

Q And are you presently employed as an informer for the State police?

A Yes.

Q And is this for pay?

A Yes.

Q The State police owe you anything—owe you any money at this time?

A I don't believe so.

Q How much money are you expecting to earn in the future from the State police, at this time?

A I have no idea.

Q No particular sums were discussed?

A There were some particular sums discussed, but whether I have time or I'm in the area, that would have . . ..

Q What about how you do with this case? That have anything to do with it?

A No, this case is . . ..

MR. RUBINSTEIN: I have no further questions.

Defense counsel was not restricted by the court from proceeding further in cross-examining Koelzer on this subject or any other.

Braham's counsel contends that the documents not produced by the prosecution would have enabled him to cross-examine Koelzer in the following critical areas: (1) the amount of compensation, if any, that was paid Koelzer by the police for acting as an informer in drug matters and, if compensation was paid, whether some was withheld pending his testimony in this case; (2) whether Koelzer used any of the drugs he was purchasing; (3) whether or not Koelzer, while purchasing drugs as a police informer, was involving himself in other illegal activities for which he was not being prosecuted; (4) Koelzer's motivation for acting as an undercover police informer, i. e., whether this stemmed from promises of compensation and the ability to obtain access to drugs for his own use, or whether the motivation resulted from coercion or

threats of prosecution due to drug involvement on his part; and (5) whether Koelzer was promised further, if not regular, employment as a police informer as a result of the work he had already done in that capacity and as a result of his testifying as a witness for the state in this case against Braham.

The documents in question—the police reports—are written accounts of Koelzer's activity as an undercover police drug informer. They show that Koelzer purchased drugs on several occasions from certain named persons with money furnished him by the police. The reports do not show whether Koelzer was involved in other illegal activities for which he was not being prosecuted, nor do they show what motivated Koelzer to perform these acts for the police other than for compensation in money. There is nothing in the reports to indicate that Koelzer was acting in this role by reason of coercion or threats of prosecution. There is no indication as to the amount of compensation Koelzer was paid for his services, although under cross-examination he admitted that he was paid for his work and that, as of the time of the trial, he believed no money was owed him by the police.

The reports are also silent on the question of whether compensation, to be paid to him by the police, was contingent upon the quality of his testimony at the trial or the outcome of the trial. But aside from the police reports, there was testimony at the trial that Koelzer was paid $600 by the police for his aid in getting evidence against Braham, for his testimony before the grand jury and if Braham were convicted of the crime of attempted murder. Furthermore, Koelzer testified during the trial that he did not believe the State police owed him anything at that time—this indicating that the $600 had already been paid to him.

 Braham also raises the issue as to whether Koelzer used any of the drugs he was purchasing as an informer. One of the reports shows that Koelzer had sampled cocaine during his undercover work. But as the state points out, personal use of a drug is not admissible for purposes of impeachment, and the use of a drug only becomes relevant if the witness is under its influence (or suffering from withdrawal) at the time he is supposed to have observed the events he is testifying about or at the time of his testimony in court.

 In summary: the police reports on Koelzer's activities as an undercover drug informer ought to have been given to Braham's counsel under Criminal Rule 16 because they were relevant. They were relevant because they showed that Koelzer was deeply involved in working for the police, which would create the material inference that he might be biased in favor of the prosecution. But the real question is whether absence of the reports served to inhibit defense counsel's cross-examination of Koelzer to the point where Braham's constitutional rights were so seriously violated that justice demands a reversal and a new trial. We believe there was no such prejudicial effect.

The jury was well aware of the fact that Koelzer was a police informer, not only in relation to Braham, but also in relation to obtaining evidence of illegal drug purchases from a number of different persons who were to be prosecuted for drug offenses because of the evidence Koelzer was able to produce. It must have been obvious to the jury that Koelzer was not being prosecuted for attempted murder, although he was a principal along with Braham in the commission of that offense. This would certainly demonstrate bias on Koelzer's part—that he informed against Braham and acted as a drug informer for the police after the Braham matter in order to curry favor with the police and to avoid prosecution. In his final argument to the jury, defense counsel made a telling point on the question of Koelzer's motivation for testifying against Braham. Counsel made these remarks:

> One thing I'd like to bring up with you just briefly is Koelzer's motives for doing what he did with the police and what he did with Harold. Koelzer would have you believe that his motives were entirely a matter of getting $600.00. But there's another interesting thing, and that is that

Koelzer is continuing to work as a police informer, the Koelzer now has a steady relationship with the police in which he goes out and does things like this or similar things involving other people, and will then presumably testify before grand juries and testify before trial juries. And as you know—for instance in this case, the events which gave rise to the case commenced in August of 1974. It is now April of '75 and the case is still at trial. Between the time of August '74 and April '75, Koelzer is an untouchable. Koelzer is a man who can virtually do no wrong. Now, if you were Jeffrey Koelzer and you'd lived a life for 24 years, or at least from your teens on of stealing things, of selling stolen property, of habitually using hard drugs and things like this, and if you're also a man who the police know about, if you're a man who the police have questioned about that, you've admitted your drug use to the police, if they know that you're a crook, if they know that you sell stolen property, if you live in a small town like Fairbanks, you're in a lot of trouble. Now, Jeffrey Koelzer at this point was in a very nice part of his life, the pipeline had come to Alaska; for the first time in his life, honestly—so-called—he's earning 600.00 to $1,200.00 a week or 500.00 to 1,200.00 a week, but he's got a lot of skeletons in his closet, a lot of skeletons that the police even know about or can know about without too much problem. Well, Koelzer has now got himself a pretty sweet deal. *Koelzer has made himself virtually an immune person by offering this cooperation.* So I would submit to you that the $600.00 consideration was really very meaningless, very insignificant part of

Koelzer's reasons. As McCoy said, "It would be in your best interest to get on the right side of the fence at this time," and it's exactly true, it was in his best interest and it still does continue to be in the best interest to serve the police in this fashion. [Emphasis added]

We believe that Braham's counsel *had ample opportunity to show bias on Koelzer's part and, that in his cross-examination of Koelzer and in his argument to the jury, availed himself of that opportunity. The documentary evidence not produced would, we believe, be cumulative of the testimony already presented and of the point that defense counsel made regarding the nature of Koelzer's testimony and his role as an informer.

Considering all of the circumstances, we are of the opinion that, even though the court's error in denying compulsory process for Braham with respect to the police reports mentioned above was of a constitutional dimension, the error was harmless in the constitutional sense. It is true that one may doubt that the error was harmless and in some way prejudiced Braham's rights. But the question is whether such doubt is a reasonable one—i. e., whether it is of such a nature as would cause a reasonably prudent person to hesitate before acting in a matter of importance to himself.[28] We believe that any such doubt would not be of that nature and, therefore, that the error in refusing production of the police reports was harmless beyond a reasonable doubt within the meaning of the *Chapman* standard as discussed in this court's decision in *Evans v. State*, 550 P.2d 830, 840 (Alaska 1976).[29]

---

28. *Davenport v. State*, 519 P.2d 452, 456 (Alaska 1974).

29. The Sixth Amendment to the Federal Constitution and art. I, § 11 of the Alaska Constitution, in addition to guaranteeing the right to compulsory process, also guarantee the right of the accused to be "confronted with the witnesses against him." We recognize the fact that the interrelationship between compulsory process and effective cross-examination can be so intimate that the denial of compulsory process in relation to documentary evidence may limit effective cross-examination to the point where the constitutional right of confrontation will be eroded. *See Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). But even if this case is viewed as presenting a denial of confrontation issue because of the asserted inability of Braham's counsel to cross-examine Koelzer effectively, we would still reach the same result—that is, that any error in this respect was harmless beyond a reasonable doubt.

## OTHER ALLEGED ERRORS

■ Braham makes three additional points on this appeal which require little discussion. One of them is that the court erred in allowing the state to show that a witness for the defense, a former district judge, had been censured by the supreme court. We find no prejudice to Braham in this respect and conclude there was no error.

■ Braham also asserts as error the giving of the following instruction to the jury by the trial court:

> Solicitation to commit a crime involves no more than asking or enticing someone to commit a crime. While solicitation is a step in the direction of a target crime, it does not constitute the overt act directed toward its commission that is a necessary element of the crime of attempt. However, if a defendant hires, contracts and plans with an agent to commit a crime and the defendant has done everything that was to be done by him to accomplish the crime, the defendant's conduct has gone beyond the sphere of mere solicitation and constitutes an overt act done toward the commission of the crime sufficient for the crime of attempt.

Braham had hired, contracted and planned with Koelzer to commit the crime of first degree murder. In moving toward consummation of the murder, Braham had sent Koelzer off to see Peterson at the hospital in order to foster a relationship of trust and confidence between Koelzer and Peterson. At that point Braham had done everything that was to be done by him to accomplish the crime. Braham's conduct had gone beyond the sphere of mere solicitation. He had done an act toward the commission of the crime within the meaning of the statute relating to criminal attempt. The instruction is not inconsistent with our decision and, therefore, was not erroneous.

■ The final point that Braham makes is that the six-year sentence is excessive. This assertion is without merit. The evidence shows a cold-blooded and premeditated attempt on Braham's part to have Peterson murdered. A man of such evil character is the "worst type of offender", as we have used this term in past decisions on sentence appeals [30] and, therefore, was deserving of a prison term of at least six years.[31]

The judgment is AFFIRMED.

CONNOR, Justice, dissenting in part, concurring in part.

While I appreciate the care with which the majority opinion treats the question of criminal attempt, I must respectfully dissent on this issue. My research in the area of criminal attempt leads me to the conclusion that Braham is guilty of solicitation, rather than of attempted murder.

Unquestionably Braham's conduct was reprehensible in the extreme. Short of killing itself, there can be few acts so malevolent and deserving of society's condemnation as planning the destruction of a human being in a calculated manner, using another human intermediary as the hired killer. But the question presented in this case is whether what was done amounts to an attempt or merely a solicitation, i. e., whether Braham's acts amount to an attempt under positive law.

Traditionally the law has required a close connection between the acts constituting attempt and the likelihood that the ultimate crime will be completed. While some theoreticians argue that the graver the contemplated crime, the further back in the series of preparatory acts one can reach to impose liability for attempt, that thesis is not supported by the case law on which this theory appears to rest.[1]

---

**30.** *See Bordewick v. State*, 569 P.2d 184 (Alaska, 1977); *State v. Wortham*, 537 P.2d 1117, 1120 (Alaska 1975).

**31.** The maximum prison term for one who is convicted of attempt to commit a crime, such

as murder in the first degree, is ten years. AS 11.05.020.

**1.** That theory is normally supported by reference to Mr. Justice Holmes. *See* Holmes, The Common Law 68–70 (1881); *Commonwealth v.*

Only one aspect of attempt law requires discussion in this appeal: the distinction between mere preparation and acts of perpetration. More particularly, we are dealing with the solicitation of an agent to perform a killing. We must decide what acts are required to take the situation beyond mere preparation and become a culpable attempt. We cannot reach a solution by merely manipulating the language in which general doctrine is expressed. What is required is a critical examination of the case law in light of the facts on which those cases have turned. For criminal attempt is an area of law in which the actual holdings of courts, on particular facts, provide far more valuable guidance than do the verbal formulae offered to explain those holdings.

Such an examination will reveal that there must be a tight connection between the acts done and the probability of successful perpetration of the criminal objective. I find such a nexus lacking under the facts of this case.

Although there are a few cases in which courts have said that "slight acts" will suffice for the more serious ultimate objectives, such as murder, the reasoning supporting these opinions is flawed in several ways. In many instances the statement by the court is broader than the facts require. In other cases, and these are not numerous, the holding and the statement of the governing principle are based upon a misunderstanding of earlier holdings, or are simply at variance with established law, or both.

The close connecting link which has usually been required between the acts constituting attempt and the ultimate crime is frequently referred to as the "proximity" requirement. Acts of mere preparation—of setting the stage for the commission of an offense—do not amount to an attempt.[2] As the author of the majority opinion recognizes, what is required for criminal culpability is the formation of criminal intent, a preparation to commit the crime, and a direct unequivocal act towards its perpetration. Although I agree with the majority that this is the proper test, my application of it to the particular facts of this case requires me to arrive at a result different from that reached by the majority.

Mr. Justice Holmes recognized in *Commonwealth v. Kennedy*, 170 Mass. 18, 48 N.E. 770, 771 (1897), that this general rule cannot be reduced to a mechanical test to determine the point at which a defendant's conduct passes over the line of mere preparation and becomes punishable as a direct act towards the commission of the ultimate offense:

"As the aim of the law is not to punish sin, but is to prevent certain external results, the act done must come pretty near to accomplishing that result before the law will notice it. . . ."

But words of general meaning such as "pretty near" can only be stretched a certain amount before the meaning of the statutory prohibition becomes warped beyond the recognizable intentions of the lawmaker. To make sense out of attempt doctrine we must look to decide cases, paying close attention to the facts.

A classic definition of attempt is found in *Commonwealth v. Eagen*, 190 Pa. 10, 42 A. 374, 377 (1899):

"An attempt . . . is an overt act, done in pursuance of an intent to do a specific thing; tending to the end but falling short of complete accomplishment of it. In law, the definition must have this further qualification,—that the overt

---

*Peaslee*, 177 Mass. 267, 59 N.E. 55, 56 (1901) (Holmes, J.); *Commonwealth v. Kennedy*, 170 Mass. 18, 48 N.E. 770, 771 (1897) (Holmes, J.). These cases will be discussed later in this opinion. It will be seen that when tested against the cases, Holmes' doctrinal statement is far too broad.

**2.** Thus, procuring poison and delivering it to another to place in the victim's well or drink has been held insufficient as an attempt. *Sta-*

*bler v. Commonwealth*, 95 Pa. 318 (1880); *Hicks v. Commonwealth*, 86 Va. 223, 9 S.E. 1094 (1889). And merely meeting a confederate at an appointed place, on the way to commit a burglary, and the purchase of extra cartridges and chloroform to be used in the burglary, was held not to amount to an attempt in *People v. Youngs*, 122 Mich. 292, 81 N.W. 114 (1899).

act must be sufficiently proximate to the intended crime to form one of the natural series of acts which the intent requires for its full execution. So long as the acts are confined to preparation only, and can be abandoned before any transgression of the law or of others' rights, they are within the sphere of intent, and do not amount to attempts."

Many courts have held that where one solicits or hires another to kill, but himself does no act, directly or indirectly, toward the consummation of the intended crime, the act of hiring the killer amounts to no more than solicitation or preparation. For example, in *State v. Davis*, 319 Mo. 1222, 6 S.W.2d 609 (1928), the defendant and the wife of the proposed victim plotted to kill the husband, to collect the life insurance proceeds, and then to live together. They sought the help of an ex-convict to carry out their plan. A police officer, posing as the ex-convict, met with defendant several times. In the course of these meetings, defendant gave the undercover officer a map showing where the husband could be found, as well as two photographs of the intended victim. The defendant promised to pay the agent $600, and later did pay that sum. He also arranged matters so that the murder would appear to have been committed in the course of a robbery. The plot was foiled by police intervention. Because the agent employed to commit the murder did no act toward the consummation of the intended crime, the court held that defendant's acts amounted to no more than solicitation or preparation.

In *Hicks v. Commonwealth*, 86 Va. 223, 9 S.E. 1024 (Va.1889), the defendant solicited an agent, with a promise of reward, to administer strychnine to the intended victim. The defendant also purchased the strychnine and gave it to the agent with instructions to place it in the victim's coffee. It was held that these acts, without more, were only preparatory measures for the commission of the crime, and not an attempt.

This line of authority was followed in *People v. Adami*, 36 Cal.App.3d 452, 111 Cal.Rptr. 544 (1973). There the defendant told an undercover agent that he wanted his wife killed. He was introduced to a second undercover agent, to whom the defendant gave $500, a photograph, and a written description of his wife, with instructions to kill her. The appellate court, per Molinari, P. J., held that the defendant's conduct amounted solely to solicitation or mere preparation. The court found it significant that the defendant did not supply or employ any instrument or other means to procure his wife's death. Additionally, the agent, who had only simulated his agreement to kill, had performed no act toward the commission of the crime.

Turning now to the cases on which the majority opinion relies, it is my opinion that some of them are distinguishable from the case at bar, while others are at best poorly reasoned.

In my view, *State v. Mandel*, 78 Ariz. 226, 278 P.2d 413 (1954) was wrongly decided. In that case, a woman tried to hire an agent to kill her husband. She drove the agent past her husband's house, and showed him a place where the body could be disposed of after the crime. She had several meetings with the hired killer, including one on the day appointed for the murder. She also gave the killer a down payment. In holding that these acts amounted to an attempt, the *Mandel* court seems to reason that had it not been for a police subterfuge, the victim would have been murdered. Yet nothing in the facts of *Mandel* shows that either the defendant or her "agent" did anything beyond merely setting the stage for the consummation of the crime. The first direct act toward that consummation was never commenced. Or, to put it another way, no appreciable fragment of the crime charged was accomplished.

In criticism of *Mandel*, the court in *People v. Adami, supra,* said:

"In sum, the contemplated murder would not have resulted in the usual course of natural events since neither the 'agent' nor the solicitor did any unequivocal overt act which can be said to be a commencement of the commission of the intended crime." 111 Cal.Rptr. at 548.

The *Mandel* case ignores the problem of "proximity," or the remoteness of the defendant's acts from the consummation of the target offense. The court states merely that there must be evidence that the defendant intended that the crime be committed and took some steps or did some act toward its conclusion. At another point the court says, "When an intent is clearly shown, slight acts in furtherance thereof will constitute an attempt." 278 P.2d, at 415.

What is truly revealing in *Mandel* is its reliance upon, and quotation from, *Stokes v. State*, 92 Miss. 415, 46 So. 627 (1908), in which the Mississippi court said that "slight acts" may constitute attempt. Speaking of the distinction between preparation and consummation, the court in *Stokes* complained that

"[t]oo many subtle distinctions have been drawn along these lines for practical purposes. Too many loopholes have been made whereby parties are enabled to escape punishment for that which is known to be criminal in its worse [sic] sense." 46 So., at 629.

In short, the court in *Stokes* says that we can do away with traditional criteria of culpability, and punish for bad intentions and "slight acts" if we find the intentions of the defendant to be malevolent. This amounts to a reversion to the discredited doctrine of *voluntas reputabitur pro facto*.[3] The *Stokes* holding is contrary to the principles underlying the law of attempt as exemplified by the decisions which adhere to the classical requisites of criminal liability.

*Stokes*, on which *State v. Mandel, supra*, rests, is distinguishable from the case at bar in a number of respects. In *Stokes* there was a plot between Stokes and Cora Lane to kill Wallace Lane, Cora's husband. They hired one Robertson to perform the killing on a particular night when Wallace Lane would be returning from a lodge meeting. Robertson, however, told certain police offi-

cers about the plot. On the evening in question, Stokes procured a loaded gun and went with Robertson to the place where the killing was to be done. As Stokes was in the act of handing the gun to Robertson, he was arrested by the police officers, who had been surveilling them.

The problem before the court in *Stokes* was whether the defendant's acts went beyond mere preparation, the defense being that because Wallace Lane did not appear at the scene, an overt act was not shown. It was in this context that the court uttered the language about "slight acts" and "loopholes," seized upon later by the court in *Mandel*. In comparison with other cases the holding in *Stokes* extends liability on quite a broad basis. Yet the facts of *Stokes* show a much greater "proximity" to the target offense than the facts in *Mandel*.

*United States v. Coplon*, 185 F.2d 629 (2d Cir. 1950), cited in the majority opinion, concerns an unusual fact situation, specifically an attempt to deliver national defense secrets to a foreign agent. At the time of her arrest, Coplon was walking on the streets of New York City with the foreign agent. The national defense information was in her handbag and had not yet been passed to the agent. Other circumstances in the case demonstrated Coplon's intent to pass the information to her companion. Speaking through Learned Hand, J., the court held that Coplon's conduct amounted to an attempt.

The gist of the opinion in *Coplon* is that acts short of the very instant of consummation of a crime can constitute an attempt, as distinguished from preparation. The court relied upon the opinion of Mr. Justice Holmes in *Commonwealth v. Peaslee*, 177 Mass. 267, 59 N.E. 55 (1901), to the effect that preparation which comes very near to the accomplishment of the act, coupled with the intent to complete it, renders the commission of the crime so probable that liabili-

---

**3.** The maxim, which can hardly be called a doctrine, of *voluntas reputabitur pro facto* —that the intention shall be taken for the deed—if it ever had any validity in the early common law, rested upon judicial dicta and

misunderstanding of precedent. In the law of criminal attempt it represented at best a weak rationalization which has long been abandoned. *See*, F. Sayre, "Criminal Attempts," 41 *Harv.L. Rev.* 821, 822–37 (1928).

ty will attach for an attempt. But it certainly cannot be said that the *Coplon* case represents any new departure in this area of law. Nor does it support any theory about "remote" acts, coupled with an intention to commit a serious crime, being an adequate basis for imposing liability for criminal attempt. Judge Hand's main focus of interest in *Coplon* is on whether one may pass beyond mere preparation even though he has not taken the last of his intended steps, "in short that he has passed beyond any *locus poenitentiae*." 185 F.2d 633. He answers that question in the affirmative.[4]

*United States v. Mandujano*, 499 F.2d 370 (5th Cir. 1974), is a case of attempted distribution of heroin. In addition to its facts being highly distinguishable from the case at bar, its legal holding is questionable. No showing was made in *Mandujano* that the defendant at any relevant time had access to or possession of any heroin to distribute. The conviction rested solely on the receipt of money, which the court artificially termed a substantial step toward the commission of the target offense.

*State v. Gay*, 4 Wash.App. 834, 486 P.2d 341 (1971), holds that an attempt was committed where the defendant forged an assignment of her husband's insurance policy, paid the premiums, and then hired an assassin (feigned) to kill her husband. For the most part the case follows *State v. Mandel, supra*, and provides no helpful analysis of the law of attempt.

I now turn to two opinions of Mr. Justice Holmes which have, perhaps unintentionally, created much confusion in the law of criminal attempt. *Commonwealth v. Kennedy*, 170 Mass. 18, 48 N.E. 770 (1897), was a case of attempted murder by means of poison. The defendant was charged with having placed rat poison, containing arsen-

ic, on the underside of the crossbar of the mustache cup of the victim, Learoyd, with the intent that Learoyd should drink from the cup and swallow the poison. The indictment was challenged on appeal in part because it failed to allege that the amount of rat poison placed in Learoyd's cup was sufficient to kill. In holding the indictment sufficient, Mr. Justice Holmes noted that the unlawful administration of poison is an act which, in common apprehension, is likely to cause death. In this connection he noted that liability for attempted murder could attach even though the amount of poison was not shown with certainty to be lethal. He then stated:

> "[A]nd the gravity of the crime, the uncertainty of the result, and the seriousness of the apprehension, coupled with the great harm likely to result from poison, even if not enough to kill, would warrant holding the liability for an attempt to begin at a point more remote from the possibility of accomplishing what is expected than might be the case with lighter crimes." 48 N.E., at 771.

He then referred to cases holding that impossibility of achievement is not necessarily a defense, citing cases in which an attempt was found even though the acts done would not result in the ultimate offense unless they were followed by other criminal acts.[5] *Commonwealth v. Kennedy* is significant in that the facts themselves show a high degree of "proximity" between the placing of the poison in the victim's cup and the target offense of murder by poison. The doctrinal statement of Mr. Justice Holmes must be read in that factual context.

*Commonwealth v. Peaslee*, 177 Mass. 267, 59 N.E. 55 (1901), was a case of attempted arson. The defendant arranged combusti-

---

4. I agree that an attempt can be committed even though there remains a *locus poenitentiae*. My point is that the *Coplon* case, on its facts and on the legal questions presented, bears little resemblance to the case at bar.

5. As to the latter, Mr. Justice Holmes cited *Lewis v. State*, 35 Ala. 380 (1860), in which a black man chased a white woman for more

than a mile. Although he had not come within ten steps of the woman, and there was no other manifestation of his intent, his conviction for attempted rape was affirmed. It is submitted that the provenance of the case, and the race of the defendant, make it a weak base upon which to support a general theory.

bles in a building so that if they were lit by a candle, the building would be burned. He then offered to pay a younger man in his employment to go to the building, several miles away, and carry out the plan. The employee refused, but later drove with defendant towards the building. When they were within a quarter of a mile of their target, the defendant said that he had changed his mind. He then drove away.

The actual holding in *Peaslee* is that the indictment was insufficient because it did not allege defendant's solicitation of his employee as an overt act. The court clearly holds that the defendant's own acts, if taken alone, would be merely acts of preparation. The implication is that defendant's solicitation of his employee could amount to an overt act. But it is not clear that this is a definite holding of the court, because such a holding would have been unnecessary to decision. Therefore, the statements of Mr. Justice Holmes in this case about the relativity of attempt doctrine must be considered *obiter dictum*. The *Peaslee* case cannot be taken as either establishing or supporting a broad form of criminal liability for "slight" or "remote" acts in the preparation or execution of a criminal design. If anything, it shows that Mr. Justice Holmes' doctrinal formulation in terms of "remoteness" or "degree" must be read within severe practical limits.[6]

If there is any doubt about the limited nature of the *Kennedy* and *Peaslee* holdings, and about their fragility as sources of doctrinal change, it is dispelled by the later utterances of their author.

In *Hyde v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912), Mr. Justice Holmes, in dissent, sheds light on what he meant in his earlier Massachusetts opinions. In drawing a distinction between conspiracy and attempt, he said:

"An attempt, in the strictest sense, is an act expected to bring about a substantive wrong by the forces of nature. With it is classed the kindred offense where the act and the natural conditions present or supposed to be present are not enough to do the harm without a further act, but where it is so near to the result that, if coupled with an intent to produce that result, the danger is very great. . . . But combination, intention, and overt act may all be present without amounting to a criminal attempt,—as if all that were done should be an agreement to murder a man 50 miles away, and the purchase of a pistol for the purpose. There must be dangerous proximity to success. But when that exists the overt act is the essence of the offense." 225 U.S., at 387–88, 32 S.Ct., at 810.

Thus it is plain that even when Mr. Justice Holmes spoke in the *Kennedy* and *Peaslee* cases about gravity of the offense, remoteness, and degree, he still meant those terms to be understood only in light of existing case law. And the case law at that time did not support any broad, general theory of culpability, as has so often been attributed to Holmes' language.[7]

Where does all this discussion lead us?

It appears that very little case law supports an application of broad attempt principles to the case at bar. There are, of course, *State v. Mandel, supra*, and *State v. Gay, supra*. Analysis reveals that these cases present weakly reasoned, questionable holdings. Against them stands an overwhelming mass of case law, accumulated over centuries. *Mandel* and *Gay* cannot be defended on conventional principles of the law of criminal attempt. They amount to an abrogation of both the traditional law

---

6. Time does not permit an extended discussion of the case law cited in the *Peaslee* and *Kennedy* opinions. But a critical examination of that case law will show that for the most part either it falls within the traditional requirement of a tight "proximity" between overt act and ultimate crime, or it illustrates an entirely different type of offense, *i. e.*, one in which the substantive offense is in itself an attempt.

7. Professor Jerome Hall, in criticizing the theory that the graver the target offense, the less immediate the conduct need be to constitute a criminal attempt, agrees that this broad formulation based on Holmes' decisions will not bear careful scrutiny. J. Hall, *General Principles of Criminal Law* (2d ed. 1960) at 579–80.

and the distinction between attempt and solicitation. Plainly and simply, they represent bad law.

Solicitation alone cannot constitute an attempt to commit murder. To call solicitation an attempt is to do away with the necessary element of an overt act. At the stage of merely planning a crime, and of soliciting another to kill, there are still too many contingencies, including the willingness of the solicitee to kill, to say that the die is cast and that an overt act has occurred. To merge solicitation and attempt only bastardizes the two concepts and engenders confusion in an area of law already quite, though unnecessarily, confused.[8]

No doubt it can be argued in the abstract that in any solicitation or inducement to commit crime, but for the failure of the solicitee to carry it out, the crime might have been committed, and that this risk justifies punishing the defendant's inducements as an attempt. But the law, with the exception of such aberrations as *Mandel* and *Gay*, has never gone so far. To do so renders the crime of solicitation obsolete, and substitutes for it a vastly expanded form of criminal offense not requiring a direct unequivocal act toward the consummation of the solicited crime.[9] Surely such a conversion of solicitation into attempt is quite contrary to what the legislature had in mind when it set up the distinct categories of solicitation and attempt.

In the case at bar, all of Braham's acts were in the nature of solicitation or inducement. At all relevant times it was Braham's manifest intention that Koelzer perform the acts of perpetration. Although requested to, Braham did not furnish to Koelzer a weapon with which to perform the killing. Braham did give instructions to Koelzer several days in advance of the contemplated killing of how the plan should be effectuated. But no acts were ever committed by either Braham or Koelzer which put them in dangerous proximity, geographic or temporal, to actually killing Peterson.[10]

In summary, I believe the majority opinion applies the law of criminal attempt in a demonstrably erroneous manner. Because there was no direct, unequivocal act toward the commission of the target crime, which placed the actors in a dangerous proximity to the killing of the intended victim, I would reverse the conviction.[11]

**8.** *Accord, Gervin v. State*, 212 Tenn. 653, 371 S.W.2d 449 (1963); R. Perkins, "Criminal Attempt and Related Problems," 2 *U.C.L.A.L.Rev.* 319, 349–53 (1955).

**9.** Professor Perkins goes so far as to argue that,
 "solicitation of another to commit a crime is an attempt to commit that crime if, but only if, it takes the form of urging the other to join with the solicitor in perpetrating that offense, —not at some future time or distant place, but here and now, and the crime is such that it cannot be committed by one without the cooperation or submission of another, such as bribery or buggery." R. M. Perkins, *Criminal Law* (1957) at 519.
 Under the Perkins analysis, Braham's acts presumably would not constitute attempt on both grounds: the killing urged by Braham was to be perpetrated at a future time and distant place, and was to be committed by Koelzer alone.

**10.** As the court did in *State v. Lourie*, 12 S.W.2d 43 (Mo.1928), I would hold that where one hires or incites another to do a criminal act, he is, apart from his own acts, responsible only for what the other person actually does pursuant to the incitation.

**11.** Like the majority I would strongly urge that the legislature consider enacting a statute which separately penalizes arrangements to kill for hire. But the absence of such a statute does not justify us in penalizing solicitation as attempt. It should be noted that solicitations such as Braham's are punishable by up to three years imprisonment. *See* AS 11.10.070.