Clifford Wayne MOSSBERG, Appellant,

v.

STATE of Alaska, Appellee.

Edward SMITH, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 4009, 4184, 4560.

Supreme Court of Alaska.

Feb. 27, 1981.

Jonathan H. Link, Fairbanks, for appellant Mossberg.

Max F. Gruenberg, Anchorage, for appellant Smith.

Natalie K. Finn and Larry C. Zervos, Asst. Dist. Attys., Harry L. Davis, Dist. Atty., Fairbanks, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before RABINOWITZ, C. J., and CONNOR and MATTHEWS, JJ.

RABINOWITZ, Chief Justice.

These consolidated appeals are brought by Mossberg and Smith from their respective convictions of arson under AS 11.20.-010, stemming from the burning of the "Bennett Lodge" at Mile 101, Steese Highway, on April 20, 1977. The arson was the result of a chain conspiracy comprised of four links. This appeal allegedly involves the first link (Mossberg) and the third link (Smith). The second link, James Judkins, turned state's evidence and was the primary witness at the joint trial of Mossberg and Smith. The fourth link, Jimmy Roy ("Flash") Williams, the one who actively set fire to the Bennett Lodge, had been convicted prior to appellants' trial.

The relevant factual background is as follows: in March 1976, Mossberg gave Bennett, the owner of the Lodge, $2,000 for an option to buy the Lodge. Having failed to tender the balance within the required time, Mossberg lost the option and forfeited the $2,000. Subsequent attempts to renegotiate the deal failed, and Bennett rejected Mossberg's final offer in March of 1977. This is allegedly Mossberg's motive for arranging the arson.

Mossberg contacted Judkins, who approached appellant Smith (then residing with the Judkinses). Smith initially approached one Jim Burns but was rejected;[1] he subsequently contacted Williams, who agreed to do the job. It was planned for the spring of 1977, while Mossberg was to be in Arizona.[2] The Lodge was burned on April 20, 1977.

Judkins, arrested during the summer of 1977 on some unrelated charges and facing two probation revocations, agreed to furnish the state with information in exchange for favorable treatment on his many pending criminal charges. The state insisted that Judkins procure corroboration for his statements by wearing an electronic transmitter while engaging Mossberg and Smith in conversations.

Judkins made four tapes in this manner: one with Mossberg on September 28; one with Smith on October 3; another with Mossberg on October 11; and another with

---

1. Burns evidently told Smith that the job would require two people, which is why the total price went from $700 ($200 finder's fee plus $500 for the actual job) to $1200 ($200 finder's fee plus $1000 for the actual job).

2. There were actually two attempts to burn the Lodge. On the first, Williams had Bob Sampson (Williams' roommate and a successful cocaine dealer) drive him to the site and wait while Williams did his work. Although Smith reported back to Judkins that the deed was done, Judkins hired a pilot (David Coe) to fly him (Judkins) to Circle to double check. Finding that the Lodge had not burned, he contacted Smith. Subsequently, the Lodge was burned on April 20, 1977.

Soon after, Sampson noticed that Williams had decorated their apartment with a caribou rack, a fossilized buffalo horn, an antique vacuum gauge, antique cash register, and other assorted property from the Lodge.

Sampson's house was raided by the police on May 16, 1977, in connection with his drug dealings, and the police found the Lodge property. Sampson told them of his trip with Williams and the appearance of the property. Jim Burns also informed the police of Smith's attempt to get him to burn the Lodge.

Smith also on October 11. Prior to these tapings, Superior Court Judge Blair had rendered his decision in *State v. Glass*, No. 77–1003 Cr. (Alaska Super., 4th Dist., Fairbanks, July 29, 1977), *aff'd*, 583 P.2d 872 (Alaska 1978). The state did not attempt to get a warrant to monitor these conversations, but did take care to avoid taping any conversations in the homes of either Mossberg or Smith, thus intending to comply with the perceived scope of Judge Blair's decision.

At trial, appellants moved to exclude the tapes on the basis of Judge Blair's decision in *Glass* and Superior Court Judge Hodges' approval of this ruling in *State v. Thornton*, No. 77–1870 Cr. (Alaska Super., 4th Dist., Fairbanks, Nov. 22, 1977), *aff'd*, 583 P.2d 886 (Alaska 1978). Judge Van Hoomissen denied the motion, indicating his disagreement with the decisions of Judges Blair and Hodges. He also denied the motion to suppress on the grounds that the tapes' prejudicial impact outweighed their probative value. Judge Van Hoomissen did order that certain portions of the two Smith-Judkins tapes could not be read to the jury. Appellants' attempts to obtain a stay in the superior court, as well as a petition for review in this court, failed, and the trial proceeded.

After trial, two new issues developed. First, Smith moved for a new trial based on newly discovered evidence, which motion was denied. Second, Mossberg applied for a protective order at his sentencing hearing, requesting that any statements in allocution not be admitted against him in subsequent proceedings. This also was denied, and Mossberg then refused to make any statement on his own behalf at sentencing.

Smith was sentenced to ten years with three suspended, and Mossberg to fifteen years.

## I. THE TAPES

Mossberg and Smith advance two principal arguments in support of their contentions that the superior court erroneously admitted the questioned tapes.[3] First, appellants argue that *State v. Glass*, 583 P.2d 872 (Alaska 1978), should apply to their cases, and, second, that the probative value of the tapes was outweighed by their prejudicial impact.

### A. The Glass Issue

In *State v. Glass*, 583 P.2d 872 (Alaska 1978) (*Glass I*), this court held that warrantless electronic monitoring of a conversation between a police informant and a defendant violated the defendant's rights of privacy and freedom from unreasonable searches and seizures under Article I, Sections 14 and 22 of the Alaska Constitution.[4] The retroactivity of this ruling was at issue in *State v. Glass*, 596 P.2d 10 (Alaska 1979) (*Glass II*). In this latter case, we declined to give the holding of *Glass I* retroactive effect.[5] Thus, the holding of *Glass I* was applied prospectively to warrantless police monitoring occurring on or after September 15, 1978 (the date of the decision in *Glass I*).[6]

---

3. It should be noted that we are not concerned with all four tapes. The primary issue is the September 28 Mossberg-Judkins tape, which was played to the jury in its entirety -and is discussed in detail by the parties. Only portions of the two Smith-Judkins tapes were admitted before the jury. Of these, some were used by Smith himself to impeach Judkins, and other portions were used by the state to refresh Judkins' memory. These latter are only tangentially discussed by the parties.

4. Article I, § 22 of the Alaska Constitution provides:

 The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section.

5. Our ruling on the retroactivity of *Glass I* has been subsequently adhered to in *Gonzales v. State*, 608 P.2d 23, 24–25 (Alaska 1980), and *Robinson v. State*, 593 P.2d 621, 624 (Alaska 1979).

6. The *Glass I* rule was extended to Glass and three other individuals whose cases had been considered fairly simultaneously.

 The other three cases were *Coffey v. State*, 585 P.2d 514 (Alaska 1978), *Aldridge v. State*, 584 P.2d 1105 (Alaska 1978), and *State v. Thornton*, 583 P.2d 886 (Alaska 1978). Although the four were not formally consolidated, they were under advisement at the same time and were, in effect, considered as one case. With the exception of *Coffey*, which was

Appellants do not urge that *Glass II* be overruled, but, rather, that a limited exception be made for this case.[7] They advance four reasons in support of this position. First, the prosecution was aware of Judge Blair's superior court decision in *Glass* at the time these tapes were made and at the time the motion to suppress was decided. Second, Judkins (the informant) lied to Mossberg at the outset of the September 28 tape when Mossberg asked if Judkins were recording the conversation, and the police, monitoring the conversation, implicitly endorsed this lie. Third, the exception here would not have a significant impact on the administration of justice, as it would be a very limited one. And fourth, Mossberg points out that the agreement between the government and the informant was contingent, not on cooperation, but on conviction, and as such, the government is much more likely to be encouraging the elicitation of inaccurate and prejudicial material.

■ Analysis of appellants' arguments does not persuade us that an exception should be adopted to the ruling made in *Glass II.* The determination to make *Glass I* prospective as to monitoring activities occurring on or after September 15, 1978, was based upon the following criteria:

(a) the purpose to be served by the new standards; (b) the extent of the reliance by law enforcement authorities on the old standards; and (c) the effect on the administration of justice of a retroactive application of the new standards.

*State v. Glass [II]*, 596 P.2d 10, 13 (Alaska 1979) (citation omitted). Concerning appellants' first reason, we think that in the circumstances the police were justified in assuming that Judge Blair's decision did not encompass conversations held outside of the home,[8] and, therefore, that they need not obtain a warrant for the out-of-home monitoring conducted in this case. Thus, we conclude that the police were entitled to rely on the state of the law as it existed prior to this court's decision in *Glass I.*

■ As to appellants' second argument, we deem it sufficient to note that the trickery employed by the informant Judkins only renders the statements inadmissible if the deceit makes the defendant's waiver of a constitutional right, in this case privacy rights, involuntary. Since we have concluded that *Glass I* is inapplicable to the monitoring which occurred in this case, then appellants' constitutional rights of privacy were not implicated, and thus the voluntariness of any waiver is irrelevant.

■ Appellants' third argument is based primarily on the timing of other earlier attempts to obtain a petition for review of the superior court's ruling to admit the tapes. In our view, this argument is foreclosed by stare decisis. In *Glass II*, we noted that the line drawn as to which cases would receive the benefit of the rule in *Glass I* was an arbitrary one. 596 P.2d at 13. Nothing in appellants' timing argument convinces us that the class of cases designated in *Glass II* should be expanded.

■ Appellants' fourth argument in support of an exception to the retroactivity rule announced in *Glass II* is that the informant Judkins' agreement with the state was by its terms contingent upon conviction. Appellants thus contend that this type of agreement is "inherently disruptive of the orderly administration of justice." Assuming arguendo that appellants' interpretation of the agreement is correct, no

---

delayed because of some additional issues, they were announced on the same day as *Glass I. Glass II*, 596 P.2d 10 at 12.

The tapes in the case at bar were made during September and October of 1977, approximately one year prior to this court's decision in *Glass I.*

**7.** Justices Rabinowitz and Connor dissented from *Glass II*, indicating that *Glass I* should be applied to all cases pending on direct review as of the date of *Glass I.*

**8.** Judge Blair's decision placed significant reliance upon *Ravin v. State*, 537 P.2d 494 (Alaska 1975), which emphasized the "distinctive nature of the home as a place where the individual's privacy receives special protection." Outside of the home, the United States Supreme Court precedents did not require a warrant.

prejudice to appellants followed. The agreement was brought to the jury's attention, and was utilized by defense counsel to cast doubt on Judkins' testimony. Thus, the jury was able to weigh the agreement in assessing Judkins' credibility and his motives in eliciting the appellants' statements on the tapes.

### B. *Prejudicial Impact Versus Probative Value of the Tapes*

The parties disagree as to how relevant the tapes are.[9] The portions of the tape dealing with the arson are clearly relevant. Other matters, specifically allegedly stolen vehicles, cocaine involvement, and bad debts are arguable.

■ Taking the "other crimes" first, it should be initially noted that for one particular incident, a stolen wrecker, the superior court instructed the jury that Smith and Mossberg were "on trial for this particular charge and no other charge. And with reference to the theft of the wrecker, Mr. Smith has been acquitted of that so you may not hold that against him no matter what the tape says." We believe this instruction clearly removed any prejudice as to the wrecker. The state argues that it also did so as to the other stolen vehicles; the appellants argue that it did not extend that far.

The state further argues as to these stolen vehicles that the fact that the parties here knew of each other's prior bad acts, and had been jointly involved in some, tended to establish that the approaches (between Mossberg and Judkins and between Judkins and Smith) would be made. In the state's view, this relevance outweighs any

prejudicial impact. In support of this argument, the state cites *Braham v. State*, 571 P.2d 631 (Alaska 1977), *cert. denied*, 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978), an attempted murder case. We think the state's argument meritorious. The prosecution witness in *Braham*, Koelzer, who had allegedly been approached by Braham with a scheme to kill someone for a fee, was allowed to testify that he had sold stolen goods to Braham in the past:

This evidence had a rational tendency to show that Braham knew what kind of a man he was dealing with when he offered the 'contract' to Koelzer, that he trusted Koelzer because of his criminal proclivities to be able to discuss with him the murder of Peterson and, therefore, that it was not unbelievable that Braham would offer $600 to Koelzer to murder Peterson. This evidence had the effect of advancing the inquiry into Braham's motive or state of mind and, therefore, was relevant to a material issue in the case. The probative value of the evidence outweighed any prejudicial effect it may have had.[10]

■ As to the bad debts, the state argues that reference to Smith's owing Judkins money established a motive for Smith to get involved in the first place—*i. e.*, that he needed money to pay off his debts. We note that the prosecutor did mention this point in opening argument:

[Judkins] contacted Ed Smith and he said, you know, $500.00 for the person who burns it down, $200.00 arrangers fee, so to speak. You, Ed, owe me some money, so I—you know, I can take the $200.00, and, you know, you make the further arrangements.

**9.** Appellants rely heavily on *Eubanks v. State*, 516 P.2d 726 (Alaska 1973), where the court held that the admission of evidence of drug possession in a trial for a burglary was erroneous:

[T]o introduce a possible drug association without more in order to indicate that the defendant must be a thief requires precisely the type of leap of faith the evidence rules have been designed to prevent. Because the prejudicial content of the evidence of possible prior misconduct far outweighs its minimal probative value, the evidence is inadmis-

sible for the purpose of proving motive or intent.
519 P.2d at 729 (footnote omitted).

**10.** Smith attempts to distinguish *Braham* in that the link between the prior bad acts and the offense in question was closer; some of the stolen goods in *Braham* were guns, which could presumably be used to commit murder. However, this point was not emphasized in the reasoning in *Braham*, and was not central to our decision in that case.

Smith has raised several additional arguments in regard to the admissibility of the tapes. First, he argues that while the tape may have been relevant for Mossberg (who participated in the conversation), it was not for Smith, who did not contest Mossberg's involvement. We disagree. Mossberg's acts and involvement during the continuance of the conspiracy could be attributed to Smith, if the jury found that the two were in conspiracy together, and thus not all of the tapes' evidence as to Mossberg would necessarily be irrelevant as to Smith.

■ Second, Smith argues that several portions of the tapes were only cumulative as to Judkins' testimony. Given that the original purpose for the tapes was to establish the legally-required corroboration for Judkins' testimony as an accomplice, an ar-gument that their content was cumulative is spurious.

■ Third, Smith argues that Judge Van Hoomissen's instruction as to the stolen wrecker and failure to so instruct as to the other offenses were inconsistent. We do not agree. Although the instruction could have been clearer, it did emphasize that Smith and Mossberg were not on trial for any other charges.

■ On balance, we cannot say that the tapes should have been excluded because their prejudicial impact exceeded their probative value.

## II. *THE AMIDON INSTRUCTIONS*

Appellant Smith asserts that the superior court erred in giving the so-called *Amidon* [11]

---

11. Specifically, Smith asserts that the giving of Instructions 12 and 13 was error. These instructions were quoted in *Amidon v. State*, 565 P.2d 1248, 1260 n.35 (Alaska 1977), where they were characterized as correct statements of law.

Instructions 12 and 13, as given by the superior court, read:

(Instruction 12). When two or more persons knowingly associate themselves together to carry out a common plan or arrangement, with the intent either to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means, there arises from the very act of knowingly associating themselves together with such intent, a kind of partnership in which each member becomes the agent of every other member.

So, where the evidence in the case shows such a common plan or arrangement, evidence as to an act knowingly done or a statement knowingly made by one such person, while the common plan or arrangement is continuing, and in furtherance of some object or purpose thereof, is admissible against all.

In order to establish proof that such a common plan or arrangement existed, the evidence must show that the parties to the plan or arrangement in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish some intended object or purpose of the plan or arrangement.

In order to establish proof that a defendant, or any other person, was a party to or member of such a common plan or arrangement, the evidence must show that the plan was knowingly formed, and that the defendant, or other person who is claimed to have been a member, knowingly participated in the plan or arrangement, with the intent to advance or further some intended object or purpose of the plan or arrangement.

In determining whether or not a defendant, or any other person, was a party to or member of such a common plan or arrangement, the jury is not to consider what others may have said or done. That is to say, the membership of a defendant, or any other person, in such a common plan or arrangement must be established by evidence as to his own conduct—what he himself knowingly said or did.

If and when [it] appears from the evidence in the case that such a common plan or arrangement did exist, and that a defendant was one of the members of the plan or arrangement, then the acts and statements by any person likewise found to be a member, may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the acts and statements may have occurred in the absence and without the knowledge of the defendant, provided such acts and statement were knowingly done and made during the continuance of the common plan or arrangement, and in furtherance of some intended object or purpose of the plan or arrangement.

Otherwise any admission or statement made or act done by one person, outside of court, may not be considered as evidence against any person who was not present and did not see the act done, or hear the statement made.

(Instruction 13). Except as provided in the preceding instruction the statements of one defendant are not to be considered by you in weighing the evidence against the other unless you are convinced beyond a reasonable

instructions as they applied to the tapes. Smith contends that the jury probably interpreted the *Amidon* instructions to allow them to consider Mossberg's tape-recorded statements concerning himself (Mossberg), as attributable to Smith. This would be error, as the "conspiracy" uncontestedly did not extend to the time of the taping, and Smith was not present when Mossberg's taped statements were made.

The state contends that the terms of the instructions precluded the possibility appellants raise. Instruction 12 does, at two points, contain a requirement that, to be admissible against all conspirators, the act or statement have occurred during the continuance of the plan or arrangement; and it was clear to the jury that the tapes, made five months after the actual fire, were recorded long after the common plan was over.

 Smith additionally points to part of the prosecutor's final argument that "the statements made by Mr. Mossberg to Mr. Judkins in planning this little item, can be attributed to Mr. Smith." The state

contends that "item" refers to the arson itself. Smith asserts that it is ambiguous, and could easily have been interpreted to refer to the cover-up phase as well as the arson itself.[12]

 We find we are in agreement with the state's points regarding this specification of error. Instruction 12 indicated to the jury that Mossberg's statements on the tape should not be attributed to Smith. There is no problem in attributing Mossberg's statements on the September 28 tape to himself.[13]

### III. ACCOMPLICE–AS–A–MATTER–OF–LAW INSTRUCTION

Appellants claim that the superior court erred in not instructing the jury that Judkins was an accomplice as a matter of law.

 Neither appellant objected to the superior court's failure to instruct the jury that Judkins was an accomplice, nor did they voice any objection to the accomplice instruction which was given to the jury.[14] Thus, we conclude that the issue

---

doubt that a statement by one was adopted by the other as his own. You must weigh any such statements with caution and scrutinize the surrounding circumstances to determine whether they were made freely and voluntarily. A statement by one defendant may be attributed to the other where the defendant making the statement was named by the other defendant as one whose expected utterances the other approved beforehand, or, where the other, by his conduct, makes it clear beyond a reasonable doubt that the defendant making the statement was doing so as spokesman for both.

12. Mossberg expands on this argument, asserting that the instruction allowed Judkins' statements on the September 28 tapes, Smith's statements on the October 3 and October 11 tapes and "all other acts or omissions," including Williams' conviction, to be attributed to Mossberg. We disagree. Judkins' statements on the September 28 tape, even if improperly admitted, were harmless in light of the fact that he testified himself. Smith's statements on the October 3 and 11 tapes were submitted by the prosecution to impeach Smith, and were so limited by the court. (Other portions were submitted by Smith to impeach Judkins.) Williams' conviction and Judkins' other criminal acts are too far removed from the wording of

the instruction to have played a role in the jurors' deliberations.

13. As to those short portions of the Smith-Judkins tapes which were revealed to the jury, their admission was not error in relation to Mossberg's conviction for the reasons set forth in note 12, *supra*.

14. "The main purpose of [Criminal Rule 30(a)] is to require errors to be drawn to the attention of the trial court in time for their correction so as to avoid the inconvenience and expense of a new trial. Another reason is to obviate the temptation to save defenses for the purpose of obtaining a new trial on appeal." *Dimmick v. State*, 449 P.2d 774, 776 (Alaska 1969) [footnote omitted].

Alaska R.Crim.P. 30 reads:

(a) *Requested Instructions-Objections.* At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. Additionally, the

has not been properly preserved for our review.[15] Furthermore, we are persuaded that in the circumstances of this case the absence of an accomplice-as-a-matter-of-law instruction was not erroneous, let alone plain error.

In this regard, appellants rely on *Mahle v. State*, 371 P.2d 21, 24–25 (Alaska 1962), where this court held that the failure to give an accomplice-as-a-matter-of-law instruction was reversible error. The state, on the other hand, relies on *Anthony v. State*, 521 P.2d 486 (Alaska 1974), for the proposition that, when such an instruction would necessarily imply that the accused was one of the accomplices, it is improper. In *Anthony*, we said, in part:

> We believe the Oregon and California courts correctly concluded that the risk that the jury would infer from the accomplice-as-a-matter-of-law instruction that the defendant was to be presumed guilty outweighs the risk that the jury would not properly discredit accomplice testimony.[16]

In *Anthony*, the joint undertaking was between two people, one of whom turned state's evidence and testified for the prosecution. The superior court gave, as to this witness, an accomplice-as-a-matter-of-law instruction. On appeal, this court reversed on the ground that the instruction placed an inference before the jury that the defendant was guilty. We think *Anthony* is controlling here. If the superior court had instructed that Judkins was an accomplice-as-a-matter-of-law, and the evidence showed that his contacts were with Smith and Mossberg, then an inference would arise that Smith and Mossberg were guilty.

Thus, we conclude that even if appellants had properly raised the point, the failure of the superior court to instruct that Judkins was an accomplice was not erroneous.[17]

## IV. THE SUPERIOR COURT'S DENIAL OF SMITH'S MOTION FOR A NEW TRIAL

Our review of the record persuades us that the superior court did not abuse its discretion in denying Smith's motion for a new trial.[18]

In support of his motion for a new trial, Smith offered the following: an affidavit from a Fairbanks jail correctional officer stating that Judkins indicated that Smith

court in its discretion may give the jury such instructions it deems necessary, at any stage of the trial. The instructions shall be reduced to writing and read to the jury and shall be taken to the jury room by the jury. No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objections. Opportunity shall be given to make the objection out of the hearing of the jury by excusing the jury or hearing objections in chambers.

(b) *Instructions To Be Given.* The court shall instruct the jury on all matters of law which it considers necessary for the jury's information in giving their verdict.

15. Implicit in our holding is the conclusion that the ambiguous exchange between Smith's trial counsel and the court which is relied upon by appellants cannot be read as an objection or a request.

16. *Anthony v. State*, 521 P.2d 486, 494 (Alaska 1974).

17. The decision as to whether the jury should be given an accomplice-as-a-matter-of-law instruction is generally a tactical one, as to which defense counsel's preferences should be given great weight.

18. The test for a motion for new trial on the basis of newly discovered evidence is as follows:

> A motion for a new trial based on the ground of newly discovered evidence has to meet the following requirements: (1) It must appear from the motion that the evidence relied on is, in fact, newly discovered, *i. e.,* discovered after the trial; (2) the motion must allege facts from which the court may infer diligence on the part of the movant; (3) the evidence relied on must not be merely cumulative or impeaching; (4) must be material to the issues involved, and (5) must be such as, on a new trial, would probably produce an acquittal.

*Salinas v. State*, 373 P.2d 512, 514 (Alaska 1962), *quoting Pitts v. United States*, 263 F.2d 808, 810 (9th Cir.), *cert. denied*, 360 U.S. 919, 79 S.Ct. 1438, 3 L.Ed.2d 1535 (1959) (footnote omitted).

was in jail for something he did not do; an affidavit from Joseph Sheehan, Smith's trial attorney, stating that he had informed Dick Madson (Judkins' attorney) of this affidavit, and that Madson informed Sheehan that Judkins was likely to invoke the Fifth Amendment if called to testify; and an affidavit from Smith, stating that: (1) Mossberg could be required to testify and waive his Fifth Amendment rights, which he had refused to do at the first trial; and (2) that Cindy Judkins, Judkins' wife, had forged Smith's name in endorsing a check to Smith from Smith's mother.

The affidavit from the correctional officer is countered by the state with one from Judkins, stating that he did not mean to suggest that Smith was innocent. The state contends that the statement in the correctional officer's affidavit is better interpreted to mean that Smith had nothing to do with actually setting fire to the Lodge. Regarding Smith's point that attorney Madson indicated that Judkins would refuse to testify at a subsequent trial, this is not properly classified as "new evidence." Smith could not present anything new at a new trial; he would only benefit in that Judkins' evidence might be lacking.

As to Smith's affidavit, it is improbable that Smith can predict whether or not Mossberg would plead the Fifth Amendment. It is not necessarily the case that Smith could force him to testify even

after Mossberg's conviction. The case law is divided as to whether conviction of a crime removes the protection of the Fifth Amendment right against self-incrimination.[19] Additionally, as the state points out, Smith's affidavit contains nothing indicating the content of Mossberg's testimony,[20] and, thus, it is not deserving of significant weight. As to Mrs. Judkins' forgery, the state persuasively argues that such evidence, which could only be used for impeachment, does not, under *Salinas*,[21] support a motion for a new trial, and that such a showing could not "probably produce an acquittal."

## V. *MOSSBERG'S SENTENCE APPEAL*

Appellant Mossberg has separately raised two points relating to his sentence: first, that the sentencing court erred in refusing to grant him a protective order allowing him to exercise his right of allocution without fear of his statements being introduced against him at a subsequent trial, should his conviction be reversed on appeal; and second, that the sentence imposed was excessive.

The protective order issue presents an interesting and complex question, and we think that additional briefing and oral argument is appropriate.[22] Since Mossberg's claim of excessiveness may be rendered moot by resolution of the protective

---

19. *See generally*, Annot., 9 A.L.R.3d 990 § 3 (1966). The majority rule seems to be that a conviction does remove the privilege as to that specific crime, with some cases indicating that the privilege is not lost until after both conviction and imposition of sentence, and some others postponing the loss even further until after "satisfaction" of sentence. If the conviction is still being contested on appeal or otherwise (motion for new trial, etc.), then most cases continue the privilege. There is authority *contra* on all these points.

20. It should be noted, however, that at Smith's sentencing, Mossberg's attorney stated that, if allowed to testify, Mossberg would say that Judkins told him (Mossberg) that Smith had nothing to do with them.

21. *Salinas v. State*, 373 P.2d 512, 514 (Alaska 1962).

22. This case was originally submitted for decision on the briefs alone, without oral argument.

Although it may seem that this issue has been rendered moot by our decision upholding Mossberg's conviction, such that there will be no new trial, we think Mossberg's claim still merits consideration. He chose not to exercise his right of allocution in light of the judge's decision, and thus sentence was imposed without him having the benefit of personally addressing the sentencing judge. We do not regard it as advisable to require a defendant to exercise his right and then face the danger of those statements being introduced against him at a subsequent proceeding in order to raise the issue; it can just as well be resolved on the basis of the factual situation presented here.

order question, it is inappropriate to address the excessiveness issue at this point. We do not think that further briefing on the excessiveness issue would be of any significant value, although the parties may choose to address the issue further.

As to appellant Smith, the judgment of the superior court is Affirmed. As to appellant Mossberg, the judgment of conviction is Affirmed. Decision of the sentence appeal is postponed pending further briefing and oral argument before this court.

BURKE and BOOCHEVER, JJ., not participating.