Christopher **THOMAE**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. 5012.

Court of Appeals of Alaska.

May 21, 1981.

---

G. Blair McCune, Cowper & Madson, Fairbanks, for appellant.

David Mannheimer, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage and Wilson Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C. J. and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

In the early morning hours of April 29, 1979, Christopher Thomae shot John Reams, Sr., three times at close range, killing him. Thomae was indicted for first degree murder. At his subsequent trial the jury found Thomae guilty of second degree murder. The trial judge imposed a sentence of fifteen years. Thomae appeals to this court from his conviction, alleging that the trial court made several erroneous rulings. We have reviewed Thomae's allegations and affirm the decision of the trial court. The

facts of the case will be set out as necessary to explain the basis for each ruling.

## THE STATEMENTS OF DENNIS CRONK

Thomae argues that the trial court erred in admitting as evidence certain statements made by Thomae's alleged co-conspirator, Dennis Cronk. The prosecution's theory at trial was that Christopher Thomae and Dennis Cronk conspired to kill John Reams, Sr. The state's theory of motive was that Thomae and Cronk wished to prevent Reams from harming his recently estranged wife, Betty Reams, who had filed for divorce some two months before.[1] In addition, the state suggested that Cronk wished to prevent Reams from selling the house in which Cronk, Thomae, and Reams's son, Chuck, lived rent free with Reams.[2] The essence of the state's theory was that Dennis Cronk deliberately provoked Reams, who was highly intoxicated, into a violent rage by telling him he had been having sexual relations with Betty Reams. John Reams Sr. went to his gun cabinet, pulled out a loaded shotgun and came after Cronk, who led Reams downstairs by Cronk's room where Thomae waited inside the door. Cronk ran past the door with Reams in pursuit, and Thomae shot and killed Reams with Cronk's .22 caliber pistol. Thus, the state's theory was that Thomae and Cronk conspired to make the shooting look like self-defense, but in reality the shooting of John Reams was a set-up. Thomae's defense was that he had shot John Reams in self-defense in fact and that there was no conspiracy with Cronk.

The first statement of Dennis Cronk which Thomae argues was erroneously admitted allegedly took place at Harding Lake, near Fairbanks, several hours before Reams's death. Shawn Murphy, a girl

friend of Chuck Reams, was invited to a party at Harding Lake. Chuck Reams, Dennis Cronk, Chris Thomae, Shawn Murphy, and Shawn's sister, Tara Murphy, all started to the party at Harding Lake. Halfway to the lake their car quit running. When they found they could not fix the car, they built a fire alongside the road, cooked steaks and drank beer. They called John Reams, Sr., to help them. John Reams, Sr. arrived in a truck accompanied by his son, John Reams, Jr., John Reams Jr.'s wife, Deborah, and their baby. The disabled car was taken to a nearby bar and left there. Everyone then went on to Harding Lake in John Reams Sr.'s truck because Shawn Murphy wanted to go to the party. When they arrived at Harding Lake, Shawn Murphy found the cabin where the party had been, but the party was over so they decided to return to town.

It was during this period of time that one of the critical statements allegedly occurred. According to the testimony of John Reams, Jr., he and Dennis Cronk got out of the truck to relieve themselves while the others were searching for the cabin where the party was located. He testified that:

A. Dennis, before Chris [Thomae] had come there, Dennis had told me that dad was going—had been threatening my mother, and that something was going to have to be done about it, or he was going to kill her, and Chris came up and then Dennis said that they were going to stop them. He said, we was going to have to stop them before he did anything, and that he was going to be the sacrificial lamb. And then Chris said, no you're not, that I am. I going [sic] to sacrifice my life, because I have nothing to live for.

Q. What else was said at that time?

---

1. Testimony at trial indicated John Reams was very upset about his pending divorce. Betty Reams testified John Reams would call her on the telephone and cock a shotgun, threatening to come over to her house and kill her. One time after delivering one of these threats, he came over to Betty Reams's apartment, and she called the police. Chuck Reams, a son of John

Reams who lived with his father, Cronk, and Thomae, testified that his father had said he was going to kill Betty Reams.

2. Cronk had helped build the house and performed a great deal of construction work without pay. In return, Cronk was allowed to live in the house rent free.

A. They asked me if I was going to squeal on them, and I told them, if you guys are asking me about killing my father, when I think about stuff, I told them I was against it. And that was it.

Thomae and Cronk both denied that this conversation took place.

The second critical statement which Thomae argues the trial court erred in admitting took place later the same evening. The group of people left Harding Lake and returned to Fairbanks. Shawn Murphy testified that some time after the group arrived back at John Reams Sr.'s house, she went upstairs to ask Dennis Cronk for a cigarette. As she went upstairs, Chris Thomae stuck his head out of the bathroom and said, "Go away. We're talking." Dennis Cronk then emerged from the bathroom and said, "Shawn, I don't have any cigarettes, I was just going to ask you for one, I think it's best for you to go before any more trouble starts."[3] Dennis Cronk testi-

fied that he did not remember having this conversation and did not remember being in the bathroom with Thomae. He therefore denied both the conversation and the meeting.[4]

A short time after Thomae and Cronk allegedly had this conversation, Cronk and John Reams, Sr., got into an argument. According to Cronk, Reams accused Cronk of sleeping with Betty Reams. Cronk said, "Yeah, I am, if you want to shoot someone, go ahead and shoot me." At this point Reams went to the gun cabinet and got a shotgun while Cronk fled from the house. Reams then started in pursuit of Cronk. The incident ended with Reams's fatal encounter with Thomae.

The state has urged many possible theories as to why both of the statements of Dennis Cronk should be admissible.[5] Thomae's attorney conceded at trial that both of the statements were admissible as prior inconsistent statements of Dennis Cronk[6] but

---

**3.** On the way back from Harding Lake a fight started between Dennis Cronk and John Reams, Sr., when Cronk falsely told Reams he had been having an affair with Betty, Reams's wife. The fight eventually also involved John Reams, Jr., Chuck Reams, and Chris Thomae. This may explain the reference to "more" trouble.

**4.** Chris Thomae testified that he and Cronk talked in the bathroom about the fight that had occurred on the way in from Harding Lake. According to Thomae, Cronk was upset because during the fight Thomae had fought with John Reams, Jr. Shawn Murphy had approached Thomae and Cronk about getting a cigarette. According to Thomae, Cronk told Shawn Murphy to leave. He testified he did not recall the exact words, but that it was possible Cronk told Shawn Murphy to leave before there was trouble.

**5.** The state has argued that the alleged statement to John Reams, Jr. by Dennis Cronk that "I will be the sacrificial lamb, etc." is admissible as: (1) a statement by a co-conspirator of a party during the course and furtherance of the conspiracy [Alaska R. Evid. 801(d)(2)(E)]; (2) a prior inconsistent statement [Alaska R. Evid. 801(d)(1)(A)]; (3) for testimonial completeness so that Thomae's later statement can be understood [*Braham v. State*, 571 P.2d 631, 640–41 (Alaska 1977)]; and that Thomae adopted Cronk's statements as his own, and that Cronk's statements therefore constitute an

adoptive admission by Thomae [C. McCormick, *Law of Evidence*, § 269 at 649 (2d ed. 1972); Alaska R. Evid. 801(d)(2)(B).] The state has argued that the statement by Cronk to Shawn Murphy that, "I think it's best for you to go before any more trouble starts" is admissible as: (1) a statement by a co-conspirator of a party during the course and furtherance of a conspiracy; (2) a prior inconsistent statement; and (3) an adoptive admission by Thomae.

**6.** There are two other critical statements which the state used to attempt to prove its conspiracy theory that Thomae agrees are admissible as an admission by a party-opponent (Alaska R. Evid. 801(d)(2)(A).) According to John Reams, Jr., while the fight was going on during the return from Harding Lake, he was fighting with Thomae. Thomae told him, "before the night's over, ... you ain't going to have a father." Thomae denied saying this.

In another critical statement, Tara Murphy testified that after the return from Harding Lake, Chris Thomae had made a statement that "this is going to be John's [John Reams Sr.'s] last night on earth, if he [keeps] getting so drunk." The prosecution indicated that Shawn Murphy had previously said that Thomae's statement was, "this is going to be John's last night on earth." Thomae testified that he did say something about John, Sr., not being "long for this world." However, Thomae testified this was because John Reams, Sr., was highly intoxicated and attempted to drive a car in that

argued that the statements should be limited to the purpose of showing that Dennis Cronk made prior inconsistent statements. Thomae's argument was that the statements were admissible to impeach Cronk, but not to substantively prove that a conspiracy existed and that he and Thomae set up the shooting of John Reams, Sr. The trial court ultimately ruled that the statements were admissible as statements of a co-conspirator.

▪ We do not feel that we need to decide if the statements were properly admissible as statements of a co-conspirator. Both parties correctly concede that both statements were admissible as prior inconsistent statements of Dennis Cronk. In *Beavers v. State*, 492 P.2d 88, 92–94 (Alaska 1971), the supreme court held that prior inconsistent statements could be used as substantive evidence. We have concluded the statements in this case were appropriately used as substantive evidence. First, the statements were already properly before the jury for impeachment purposes. As the supreme court pointed out in *Beavers*, trying to use limiting instructions and trying to limit the jury's use of impeachment evidence frequently creates confusion.[7] Second, Thomae was able to fully cross-examine Dennis Cronk, who allegedly

made the statements, as well as John Reams, Jr., and Shawn Murphy, who testified that Cronk made the statements. We have fully examined the transcript and statements in the context of the case and conclude that it was proper for the trial court to allow the questioned statements to be used as substantive evidence under *Beavers*.[8]

## THE CONSPIRACY INSTRUCTION AND MOTION FOR A NEW TRIAL

Thomae asserts the trial court erred in giving a conspiracy instruction.[9] He argues there was insufficient evidence to show a conspiracy between him and Cronk to plan John Reams, Sr.'s death. He also argues that his motion for a new trial should have been granted because there was insufficient evidence for the court to instruct on conspiracy.

▪ Since we have concluded that the hearsay statements of Dennis Cronk were admissible against Thomae on grounds independent of Cronk's status as a co-conspirator, it is unnecessary for us to determine whether the evidence in this case was sufficient as a matter of law to justify a conspiracy instruction.[10]

---

condition. According to Thomae, during the evening John Reams, Sr., while in such an intoxicated state, backed the car out of the driveway and then returned to the house.

7. "[I]t is likely that in many cases juries find it impossible to understand and act upon limiting instructions requiring them to consider evidence of prior inconsistent statements only for impeachment purposes and not as substantive evidence. Such instructions may then confuse rather than enlighten. They may obstruct more than they instruct. In sum, we can perceive no reason for denying prior inconsistent statements whatever testimonial credit they seem to deserve."
*Beavers v. State*, 492 P.2d 88, 94 (Alaska 1971).

8. Alaska R. Evid. 801(d)(1) treats a prior inconsistent statement as a statement which is not hearsay, following Beavers. Alaska R. Evid. 801(d)(1) reads in part as follows:
(d) *Statements Which Are Not Hearsay.* A statement is not hearsay if
(1) *Prior Statement by Witness.* The declarant testifies at the trial or hearing and the statement is

(A) inconsistent with his testimony.
*See* Commentary, Alaska R. Evid. 801(d)(1).

9. Thomae argued that conspiracy had not been shown and that no conspiracy instructions should have been given. He did not object to the particular conspiracy instructions given until after trial in a new trial motion. Whether the particular instructions which were given on conspiracy were correct has not been raised by Thomae in this appeal.

10. Because the substantive crime of conspiracy does not exist in Alaska, the only proper function of a conspiracy instruction is evidentiary in nature, relating to the co-conspirator exception to the hearsay rule recognized in *Amidon v. State*, 565 P.2d 1248, 1258 (Alaska 1977). A conspiracy instruction is thus warranted only to the extent necessary to apprise the jury of the correct ground rules for determining whether the acts and statements of one conspirator may be attributed to fellow co-conspirators. For examples of appropriate conspiracy instructions, *see Mossberg v. State*, 624 P.2d

■ The conspiracy instruction given by the court in this case was unusual in that it only defined the meaning of conspiracy, without making any attempt to explain the relevancy of conspiracy to the jury's determination of whether acts or statements of co-conspirators could properly be attributed to the defendant. As we have noted, however, Thomae did not object to the form of the court's conspiracy instruction . Moreover, since the evidence clearly establishes Thomae's conduct to be that of a principal rather than an accessory, we find no reasonable possibility that this instruction could have misled or confused the jury in determination of Thomae's guilt. Viewed in context, the conspiracy instruction was merely superfluous. To the extent that it was erroneous in form, the error was harmless beyond a reasonable doubt.

## THE PRESENCE OF THE UNIFORMED, ARMED TROOPER AT TRIAL AND THE TESTIMONY OF INVESTIGATOR MARK WAYSON

At the beginning of trial, Thomae, who was in custody, objected to the courtroom presence of two uniformed troopers who were assigned to guard him. Apparently, the troopers who guarded prisoners formally did so in plain cloths with no weapons showing, but because of a new policy at the time of trial, wore uniforms with standard service revolvers while guarding prisoners. Thomae objected that the jury might conclude that the defendant was a particularly dangerous person if two troopers, who were uniformed and openly armed, were required to guard him. The prosecutor suggested that one of the two uniformed troopers would be unnecessary if an investigating officer, in plain clothes and with no weapon showing, could act as one guard, guarding Thomae when the court, counsel, and the defendant had to leave the courtroom to discuss matters outside the presence of the jury. Thomae said that this arrangement was agreeable, but only if the investigating

officer who would be acting as a guard, Investigator Mark Wayson, was not going to testify. The prosecutor represented that Investigator Wayson would not testify in the case-in-chief, but might testify as a rebuttal witness. The court reserved ruling on whether Wayson would be allowed to testify as a rebuttal witness. Thomae did not object to being guarded by one trooper as well as Wayson if Wayson did not testify, but argued that the trooper should not be in uniform and openly armed. The court did not grant Thomae's motion concerning the trooper being in uniform and openly armed. Later in the trial Investigator Wayson was called as a rebuttal witness and the trial court ruled that he could testify.

### A. The Presence Of The Uniformed, Openly Armed Trooper

■ The Supreme Court of Alaska in *Anthony v. State*, 521 P.2d 486, 495–96 (Alaska 1974), made it clear that the trial judge has a duty to make sure that court room security does not interfere with the presumption of innocence to which a defendant is entitled:

A defendant is presumed innocent throughout the trial, and he should be permitted to face the jury with the appearance and dignity of a free and innocent man. . . . Aside from being allowed his own attire, the defendant . . . should also be permitted to make himself clean and presentable. He should be allowed to shave and to shower before appearing in court. In the courtroom, guards should remain outside the observation of the jury, and should deliver the defendant to the counsel table before the jury's arrival if necessary; manacles, shackles and other physical restraints are, of course, to be avoided. Deviation from these standards is justified only to protect the safety and decorum of the court, to prevent a threatened escape, or to respond to some other manifest necessity. Such measures

796, 803 n.11 (Alaska 1981); *Amidon v. State*, 565 P.2d at 1260 n.35. Under Rule 801(d)(2)(E) of the Alaska Rules of Evidence, use against a party of statements of a co-conspirator made in

furtherance and in the course of a conspiracy is not, strictly speaking, defined as an exception to the hearsay rule, but is rather classified as non-hearsay.

should be taken only after the defendant has been given an opportunity for a hearing, and the restraints imposed should be the least intrusive which will accomplish the desired result. [footnotes omitted] *Id.* at 496.

In Thomae's case it is apparent that the trial court did attempt to make the security measures compatible with the presumption of innocence. Thomae has made no claim that the state trooper guarding him took any action in the jury's presence which might prejudice him. We find the trial court did not abuse its discretion.

### B. The Testimony Of Investigator Mark Wayson

■ Thomae concedes that Alaska R. Evid. 615(2)[11] and *Dickens v. State*, 398 P.2d 1008 (Alaska 1965) permit an investigating officer to be present throughout the trial. We have reviewed the record and do not find the trial court abused its discretion in allowing Investigator Wayson to act as investigating officer, and in allowing him to attend the anteroom conferences.

The judgment is AFFIRMED.

---

11. Alaska R. Evid. 615 provides, in part:

*Exclusion of Witnesses.*

At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order on its own motion. This rule does not authorize exclusion of ... (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney. . . .